## McCue *versus* Commonwealth.

1. On a trial for murder it was competent to give evidence, for the purpose of showing motive, that the prisoner and the deceased both visited the same woman, that just after the homicide the prisoner said he had warned deceased not to visit her, she would prove a curse to any man, and now it had come to pass.

2. Unless the Commonwealth, shows "ingredients" of murder in the first degree, no presumption arises from the killing that the offence is higher than murder in the second degree.

3. If the evidence shows that from which it may be reasonably concluded that the murder was wilful, deliberate and premeditated, it is for the jury to pronounce the degree, and the power of the Supreme Court, under the Act of February 15th 1870, to determine whether ingredients of murder in the first degree existed, cease.

4. If the killing was not accidental, malice and a design to kill are to be presumed from the use of a deadly weapon, the law adopting the rational belief that a man intends the usual, immediate and natural consequences of his voluntary act.

5. Where upon a conviction of murder in the first degree the record does not show that before sentence the prisoner was asked if he had anything to say why sentence should not be pronounced, it is error; the sentence will be reversed, and the record remitted, that he may be sentenced afresh.

6. Jewell *v.* Commonwealth, 10 Harris 94, followed.

[McCue *v.* Commonwealth.]

March 25th 1875. Before AGNEW, C. J., SHARSWOOD, MERCUR, GORDON, PAXSON and WOODWARD, JJ.

Error to the Court of Oyer and Terminer of *Lycoming county*: Of January Term 1875, No. 51.

On the 25th of November 1874, a true bill was found against Barney McCue, for the murder of John Dieter. On the 27th of November the defendant being arraigned, pleaded "Not Guilty," and the same day the trial commenced, before Gamble, P. J., and his associates, judges of the Court of Oyer and Terminer of Lycoming county.

Barney McCue, the defendant, and John Dieter, the deceased, occupied together a room in the basement of a building on the banks of the Susquehanna, about three miles from the borough of Muncy. The furniture of the room was a few stools, a bench, and a bunk in which McCue and Dieter slept. The bunk was in a corner of the room near a window, and about eight feet from the door; the bench stood under the window between the bunk and the door; the door opened on a porch about six or seven feet wide, which extended the whole length of the house.

The Commonwealth called Charles McCarty, who testified:—

"On the 25th of October last I was at the house occupied by McCue and John Dieter. I was in the house before the shooting. Barney asked me to go in. John Dieter was lying in the bunk. Us three were there alone. Barney and I were sitting at the window. I thought John was asleep. Barney drew a pistol out of his pocket. I said, "Barney, do you carry a pistol?" He said he did; it stood him in hand to, and he would use it probably before I thought. Dieter jumped up and said, "You are always talking of putting a bullet in somebody. If you think you can put one in me, come out and try it." And John pulled his coat off as he went towards the door, and I jumped and got out first, and Barney grabbed the pistol from the window and followed. I was out first, and John ran against me and knocked me partly down. I ran across the street; Barney followed up very close. Barney walked up within four feet of John Dieter and fired. John said, "Barney, you have put one of them into me," and for an instant they were covered with smoke. Next I saw John choking Barney, in the middle of the street. I was then near to them, and turned away and left them. Not one word more was said by John to Barney in the house than I have mentioned. I had only been in the house a few minutes. Barney just came back from Beardsley's, and within fifteen minutes after, the shooting occurred. As John jumped from the bunk Barney grabbed his pistol. John ran out between the outer posts to the lower end of the steps. John stopped outside of the foot of the steps, toward the river. Barney came out between the inside posts, under the steps, and came towards John and shot him. John ran that far and then faced

[McCue v. Commonwealth.]

round toward Barney, with his right side rather towards Barney, as he came out from under the steps. * * * John had to pass Barney to get out. Barney was sitting with his back towards him. John dropped his coat before he got to the door. John did not stop, but ran right out, and did not say a word. . Barney came out under the steps, within four feet of John. John was standing about twelve feet from the door, near the foot of the steps. Barney walked right up toward him to within four feet and then shot. John had stopped and turned round. The smoke of the powder prevented me from seeing them clinch. I did not see Barney raise the pistol the second time—the smoke prevented. I was within eight feet of them—a side view. When I saw them clinched, after the smoke had raised, they were facing each other, and when they fell Barney was on the broad of his back. There was not a word said by Dieter about me being there. No quarrel; no hard words. I thought John was asleep. I heard nothing between them until John said" (as before stated).

Two other witnesses, who were sitting about twenty yards from the house, testified to about the same facts.

There was evidence also that the pistol was afterwards picked up in the road ; it was a four-barrelled revolver ; it was cocked; had two charges in it; one barrel was discharged, and the fourth was apparently empty.

There was evidence tending to show that McCue was intoxicated.

In the course of the trial the Commonwealth proposed to ask Amelia Wertman, a witness, If McCue, in August preceding the trial, wanted to pay attention to her, and at the same time wanted her to run away with him, and if at the time of Dieter's death she was not engaged to him; to be followed by evidence that McCue had said in the hearing of another witness, soon after the shooting, that he had often told the deceased that he had better leave Amelia Wertman alone, she would be a curse to any man, and now his words had come true—for the purpose of showing motive and malice.

The prisoner objected to the offer ; it was allowed by the court, and a bill of exceptions sealed.

The witness, Amelia Wertman, answered the question in the affirmative.

Catharine Reifsnyder testified that, about half an hour after the shooting she heard McCue say he had always told John to keep away from Amelia Wertman, that one part of his body would run away with his brains, and now it had come to pass.

The defendant's 5th point was :—

" If the jury believe from the evidence that the killing occurred while the prisoner was in the heat of passion, produced by the threatening actions and language of deceased towards the prisoner, then, if guilty at all, he could only be convicted of manslaughter."

The court answered :—

[McCue *v.* Commonwealth.]

" The fifth point affirmed, if the jury find in the evidence any such facts as it recites or assumes."

On the 1st of December the jury found the defendant " Guilty of murder in first degree."

The record then has this entry:—

" And now, December 6th 1874, prisoner, Barney McCue, brought into open court, and the sentence of the court is: That you, Barney McCue, prisoner at the bar, be taken from hence to the jail of the county of Lycoming, from whence you came, and from thence to the place of execution within the walls of said jail, and that you be there hanged." * * *

The defendant removed the record to the Supreme Court by writ of error. He assigned a number of errors, amongst others, the admission of the evidence objected to ; the answer to his fifth point ; that the Commonwealth did not show any motive for the crime ; there was no evidence which would furnish " ingredients" of murder in the first degree ; and that the record did not show that the prisoner was asked, before sentence, if he had anything to say why sentence of death should not be pronounced against him.

*J. J. Metzgar* and *H. C. Parsons*, for plaintiff in error.—The presumption from killing with a deadly weapon arises no higher than that it is murder of the second degree : Commonwealth *v.* Drum, 8 P. F. Smith 9 ; Johnson *v.* Commonwealth, 12 Harris 389. The prisoner should have been asked if he had anything to say why sentence of death should not be pronounced : 1 Chit. Crim. Law 700 ; 1 Archbold's Crim. Prac. 676, note ; Dunn *v.* Commonwealth, 6 Barr 384 ; Hamilton *v.* Commonwealth, 4 Harris 129 ; Dougherty *v.* Commonwealth, 19 P. F. Smith 292.

*W. W. Hart*, District Attorney, for Commonwealth, defendant in error, cited, as to the evidence containing the " ingredients" of murder in the first degree, Grant *v.* Commonwealth, 21 P. F. Smith 495. As to want of evidence of motive : Commonwealth *v.* Ferrigan, 8 Wright 386 ; Commonwealth *v.* Green, 1 Ashmead 299 ; Kilpatrick *v.* Commonwealth, 7 Casey 198 ; Cathcart *v.* Commonwealth, 1 Wright 112. If the prisoner be not asked if he had anything to say why sentence should not be pronounced, the verdict will not be set aside, but the record will be returned that the prisoner may be sentenced anew : Jewell *v.* Commonwealth, 10 Harris 94.

Chief Justice AGNEW delivered the opinion of the court, May 10th 1875.

We think the assignments of error in this case fail to show any ground for reversal, except of the sentence of the Court of Oyer and Terminer. It was certainly competent to show, that the

prisoner and the deceased had visited the same woman, and to follow this by evidence, that immediately after the homicide, the prisoner referred to the fact that he warned the deceased to let her alone, that she would be a curse to any one, and now his words had come to pass. Jealousy is among the strongest of the human passions, and it certainly was for the jury to determine, in the absence of any other assignable motive, whether it was the cause of the prisoner's act. The deceased and the prisoner had been apparently upon good terms, and lived together as single men. The witness, Amelia Wertman, testified, that she was engaged to the deceased, and that the prisoner had visited her, and proposed to her to run away. If nothing had been secretly rankling in his heart, the shooting under the circumstances stated was singular and scarcely to be accounted for. The evidence of intoxication at the time of the shooting is very slight, and the degree of intoxication must have been very little. Afterwards he appears to have been a good deal more so, though not excessively drunk.

There was no evidence that the deceased had used threatening language, or acts toward the prisoner. Hence, the answer of the court to the fifth point was correct. The facts were referred to the jury. The only material question is, whether the evidence in the case contained the elements, or " ingredients" of murder in the first degree. It is certainly true, that the Commonwealth must establish the existence of these elements, otherwise no presumption arises from the killing, of an offence higher than murder in the second degree. But if the evidence may reasonably admit of the conclusion, that the murder was wilful, deliberate and premeditated, it is for the jury to pronounce upon the degree of the crime, and a court of error will not reverse. In giving an interpretation to the Act of 15th of February 1870, we have said, if there have appeared in the testimony the ingredients to constitute murder in the first degree, our power ceases. We do not sit to hear the case as upon a motion for a new trial, to determine where the weight of evidence lies, but " to determine whether the ingredients necessary to constitute murder in the first degree shall have been proved to exist." These being proved, the jury must determine the guilt or innocence of the prisoner: Grant v. Commonwealth, 21 P. F. Smith 495.

This leads us to inquire into the circumstances of the killing. But one witness, Charles McCarty, was present. His account of the affair is concise and clear. On Sunday, October 25th 1874, McCarty was with the prisoner, who invited him to come into the house where he and the deceased lived. On going in, Dieter, the deceased, was lying in a bunk, apparently asleep. McCue, the prisoner, and McCarty took a seat by the window and took a drink of wine. McCue gave McCarty something to apply to his sore eyes, and while he was applying it McCue was hunting for

[McCue *v.* Commonwealth.]

some money in his pockets, took off his vest, and laid a pistol on the window sill.  McCarty said, "Barney do you carry a pistol?" He said he did; it stood him in hand to, and he would use it probably before I thought.  Dieter jumped up and said: "You are always talking of putting a bullet into somebody.  If you think you can put one into me, come out and try it."  He then made for the door, putting off his coat as he went.  McCarty jumped out before him, and Dieter ran against him outside of the door, throwing him upon his hands and knees.  While they were going out McCue grabbed the pistol from the window, and followed.  The witness ran across the street, and McCue followed Dieter closely, and when within four feet of him fired, the ball entering Dieter's right side in front between the seventh and eighth ribs.  Dieter said "Barney, you have put one of them into me;" and approached McCue.  McCue raised the pistol, and Dieter knocked it out of his hand, closed with McCue, threw him down, and choked him until McCue gave up.  The pistol was picked up and found cocked.  One load was discharged, two loads remained in it, and the fourth chamber seemed not to have been charged.  These are the important facts bearing upon the shooting.  The act was clearly unprovoked and needless. The deceased was unarmed, and had made no threats or demonstrations against McCue.  If what he said when he jumped up and ran out, may be construed as idle bravado, it was neither justification nor excuse for the shooting.  The pistol was loaded with three charges; it was within four feet, or six, as another witness states, of Dieter's front side, and was discharged right at him, the ball penetrating the liver, a vital organ; and the prisoner raised it again to discharge it.  What then must we say of an act so plainly directed at the life of another, so unprovoked and so barbarous, done with a deadly weapon, under no circumstances of rage or passion, produced by any reasonable cause of provocation?  Clearly, there was sufficient time to think, deliberate and premeditate the act; as clearly the act was wilful and intentional, and the instrument used a deadly one, aimed at a vital part, where death was the probable and the natural consequence of the act.  What other intention, than an intention to kill, could be rationally inferred from the whole conduct of the prisoner?  The motive may be obscure, indeed may not be fathomed; but the act was there, plainly and fully obvious to the senses, and the effect of it clearly open to the prisoner's own mind.  The ingredients of the crime of murder in the first degree were all there, however inscrutable may be the causes which moved the prisoner to commit the deed.  When all the elements of the crime are present, and when there can be but one rational inference from the act itself, retribution cannot be avoided, because the motive lies hidden and unrevealed in the heart of him only, who could disclose it.

It is true the time was short and the bullet swift, and God alone

[McCue v. Commonwealth.]

knows the motive; but the time was not too short or the messenger of death too speedy, to take from the prisoner a consciousness of the true nature of his act. Of this, therefore, the jury must judge. They had ground for their verdict and their conclusion, that the prisoner intended to kill, and wilfully, and with deliberation and premeditation shot Dieter, was not irrational or plainly unfounded. The circumstances indicated " a wicked and depraved disposition, a heart fatally bent on mischief." The act was not more sudden than that of O'Harra, who killed Aitkins, and had less provocation than his: Commonwealth v. O'Harra, Appendix to 7 Smith's Laws 694. Without adopting all the language of Chief Justice McKean in that case, I may use that of Judge Strong in Cathcart v. The Commonwealth, 1 Wright 112: "If the killing was not accidental, then malice and a design to kill were to be presumed from the use of a deadly weapon; for the law adopts the common rational belief that a man intends the usual immediate and natural consequences of his voluntary act. Human reason will not tolerate the denial that a man who intentionally, not accidentally, fires a musket ball through the body of his wife, and thus inflicts a mortal wound, has a heart fatally bent on mischief, and intends to kill." We are of opinion, therefore, that the elements of the crime found by the jury existed in the evidence, and so far there was no error.

But there is one error for which the sentence of the court must be reversed. It does not appear from the record, that the prisoner was asked before sentence, why sentence of death should not be pronounced upon him. This is a fatal error, and affects the merits of the case. It is necessary to ask the prisoner this, that he may have an opportunity, before the penalty of death be visited upon him, to plead in bar of the sentence any matter sufficient to prevent its execution. He may have found out some good reason why the trial was not legal, or he may plead a pardon, or supervening insanity. The question and the answer that he hath nothing to say other than that which he hath before said, or this in substance, must appear in the record before the sentence can be pronounced: Prine v. The Commonwealth, 6 Harris 104; Dougherty v. Commonwealth, 19 P. F. Smith 291. In this case the question may have been asked in fact, but as it does not appear in the record, and is a matter of substance, we must treat it as not having been done. In all high felonies, and especially in cases of murder, the presiding judge should see that the record is made up properly, before the term is over.

The sentence will be reversed, in order that the case may be sent back, and an opportunity afforded to the prisoner to plead in bar of it, but this error will not reverse the trial and conviction. Jewell v. Commonwealth, 10 Harris 94, 102.

[McCue *v.* Commonwealth.]

The sentence of the Court of Oyer and Terminer in this
case is reversed, and it is ordered that the record be
remitted to said court, with an order of *procedendo*, to
proceed and sentence the prisoner afresh, in due order
and process of law.