# Lanahan *versus* The Commonwealth.

1. The ingredients of murder in the first degree exist in the evidence in this case.

2. The fact of a deliberate and intentional killing having been established the inability to discover motive does not disprove the crime.

3. While flight is not evidence of the degree of murder, yet flight, under the circumstances of this case, give them strength, and they indicate the degree.

4. To establish the ingredients of murder in the first degree, the burden of proof lies on the Commonwealth, but it is not necessary that the evidence should be express ; it is sufficient if from the nature and use of the weapon and the acts and conduct of the prisoner, his intention to kill can be fully, fairly and justly inferred, with so much time and opportunity for deliberation as to convince that his purpose was wilful and premeditated.

5. The use of a *deadly* weapon, such as a *pistol*, when voluntarily directed against a mortal part, is evidence from which a jury may rationally infer an intention to kill, when the conduct of the prisoner and the circumstances under which he fires the shot corroborate and sustain the inference.

March 7th 1877. Before AGNEW, C. J., SHARSWOOD, MERCUR, GORDON, PAXSON and WOODWARD, JJ.

Error to the Oyer and Terminer of *Luzerne county :* Of January Term 1876, No. 167.

Indictment of Andrew Lanahan, the first count of which charged him with the murder of John Reilly, and the second with manslaughter.

Plea "Not guilty."

[Lanahan v. Commonwealth.]

The facts are sufficiently stated in the opinion of this court.

The chief contention in the court below was to the degree of the guilt, the defence averring that voluntary manslaughter, or at most murder of the second degree, was the grade of the offence.

The following were among the points submitted, to which are appended the answers of the court, Harding, P. J., and Handley, A. L. J.

1. That the presumption of law arising from the use of a deadly weapon, where death results, rises no higher than murder of the second degree, and that wilfulness, deliberation and premeditation, which are essential elements of the crime of murder in the first degree, must be proved by the Commonwealth to have had an existence in the mind of the prisoner, by testimony so clear and conclusive that no reasonable doubt thereof remains in the mind of the jury.

Answer. "We have already said to you in the general charge, that in order to convict of murder of the first degree, you must be satisfied beyond a reasonable doubt, that the prisoner slew Captain John Reilly, and that that slaying was wilful, deliberate and premeditated."

2. That no positive evidence has been produced by the Commonwealth in this case to show that the killing was premeditated and deliberate, and that the circumstances under which the killing took place may be reconciled with the theory of the absence of such intent.

Answer. "That is a question of fact for the jury under the evidence in the case."

3. That if the jury can reconcile the circumstances under which the killing took place with the prisoner's innocence of a deliberate and premeditated intent to take life, they are bound to do so, and in that event cannot find him guilty of murder in the first degree.

Answer. "We have already affirmed that proposition in the general charge. We affirm it again."

The portion of the general charge referred to was as follows:—

"The defence have made answer to the charge contained in this indictment. They concede, as we have said before, the killing under the circumstances as represented by the witnesses on the part of the Commonwealth, but they deny the degree of murder charged. Their theory is, that Captain Reilly and the prisoner, while coming down the road that night, within five hundred feet of the point from which they started, got into an altercation, and that Captain John Reilly then first shot Andrew Lanahan, whereupon the latter instantly fired the fatal bullet into the body of the former. In support of this theory they produce the defendant before you, and exhibit a wound which they allege was inflicted upon his person that night. (A ball was extracted from the prisoner's body in the court house by the prison physician during the progress of the trial. Rep.)

3 Norris—6

[Lanahan *v.* Commonwealth.]

" If that theory, supported by the evidence, raises in your minds a reasonable doubt as to whether this killing was wilful, deliberate and premeditated, that doubt belongs to the prisoner, and you should acquit him.    It is for you to say whether this was so or not, but it is not to be assumed, not to be gathered elsewhere than from the record of the testimony."

4.  That if the jury believe from all the evidence that the prisoner was so much under the influence of liquor, at the time the offence was committed, as to be unable to deliberate upon and premeditate the killing, and to form consciously a specific intent to take life, or if the testimony has raised a reasonable doubt as to his ability to deliberate and premeditate, he cannot be convicted of murder in the first degree.

Answer.  "We have already said this, substantially, to you in the general charge ; we have explained to you at. length what are mitigating circumstances, and particularly to what extent drunkenness must be shown to exist.    With what we have thus said to you in the general charge, we affirm this proposition."

The portion of the charge referred to was as follows :—

" The defence, gentlemen, have further answered the charge by showing that these parties, the deceased and the prisoner, were drunk on the day in question.    If you are satisfied from the testimony that Andrew Lanahan was besotted on the occasion to such an extent that he knew not what he was about, and that he perpetrated this deed while in that state or condition, then the law in its mercy reduces the offence from murder of the first degree to murder in the second degree.    But drunkenness should never be regarded as an excuse for crime.

" The man who deliberates and forms the intent to commit a murder, and then fires his courage by drinking this damning fluid, only heightens, increases the measure of his guilt.    Drunkenness is no excuse for crime, particularly if that crime be previously determined upon, and intoxication is resorted to simply for the purpose of spurring on the courage.    That drunkenness which besots, which renders a man unable to deliberate, reduces the crime which might be murder of the first degree to murder of the second degree."

The prisoner was convicted of murder in the first degree and sentenced to be hung.

He then took this writ and his assignments of error were, among others, the above refusals of his points and the portions of the charge noted.

*Henry W. Palmer, John T. Lenahan, M. M. L' Veille* and *E. L. Merriman,* for plaintiff in error.—To sustain this conviction it must be shown that the killing was malicious, premeditated and deliberate.    There was no evidence whatever of express malice. The prisoner and the deceased were friends ; there was no ill-will,

[Lanahan v. Commonwealth.]

no hatred, no antecedent threat, no evidence of former design or concerted scheme and no motive to kill, either for revenge or gain.

Can malice be implied from the circumstances attending this killing—from the character of the weapon used? The presumption of malice from the use of a deadly weapon will raise the crime no higher than murder of the second degree: Kelly v. Commonwealth, 1 Grant 492. The bare fact that Lanahan fired the fatal shot is the sole evidence upon which the jury found the deliberation and premeditation. There was nothing to show that the thought of murder had ever entered the prisoner's mind. When the buggy started from the hall the deceased and the prisoner were friends and had no quarrel or cause for quarrel. Within one minute, and before five hundred feet had been traversed, the fatal shot was fired. When did the prisoner premeditate the fatal deed? We are not bound to conclude that he premeditated the killing from the single fact that he did the deed. In the absence of proof of express malice or motive we must conclude that the shot was induced by something that happened in the wagon. Are not the facts that Lanahan was wounded on the night in question, his bloody clothing, the bullet in his side, where Reilly's right hand must have put it, evidence that there must have been a quarrel and a mutual exchange of shots?

The doctrine laid down by the court in regard to the degree of intoxication necessary to excuse or palliate the offence was too stringent: Bishop's Crim. Law, vol. 1, sect. 409; Keenan v. Commonwealth, 8 Wright 55. It is contended that the evidence failed to make out a case of murder in the first degree, and that it is the duty of this court, under the Act of 15th February 1870, Purd. Dig. 610, pl. 39, to review the same and determine whether all the essential ingredients exist: Grant v. Commonwealth, 21 P. F. Smith 495.

C. E. Rice, District Attorney, Alexander Farnham, E. S. Osborne and John Lynch, for the Commonwealth.—The counsel for plaintiff in error misapply the authority of Kelly v. Commonwealth, supra. It is true that the killing must be malicious, but it not appearing that it was done in self-defence, or in any other excusable manner, the inference of malice immediately arises from the killing itself, and murder of the first degree is presumed. There is no occasion for the use of a deadly weapon to raise this presumption. It arises from the unlawful killing, and the burden then rests on the accused to rebut this presumption, in order to reduce the grade to manslaughter: Commonwealth v. Drum, 8 P. F. Smith 17. Taking even Judge THOMPSON's ruling, that the additional fact of the use of a deadly weapon would raise the presumption to no higher degree than the unlawful killing alone would have done, and that neither intention, deliberation, nor premeditation can thereby be inferred, he yet declares that, as to these last, the instru-

[Lanahan *v.* Commonwealth.]

ment used may be evidence, and a case can be easily supposed where it must necessarily be the *only* evidence affecting the degree, and yet be considered sufficient evidence.   But it is held in Kilpatrick *v.* Commonwealth, 7 Casey 216, that the intent to take life was presumable from the nature of the weapon used.   To the same effect is Cathcart *v.* Commonwealth, 1 Wright 112.   Now how far in its legal effect does intent to take life operate ?   It is that element which necessarily removes from a case the feature of murder of the second degree.   If, then, from an unlawful killing, malice is inferred, but presumptive only, of murder of the second degree, and if, again, from the use of a deadly weapon, the intent to take life is to be presumed, malice also still being inferred, then the presumption in the latter case, not being that of murder of the second degree, must rise to that of murder of the first degree, leaving upon the defendant the burden of reducing the grade to manslaughter; by proving that the act was without malice.

Are the ingredients of murder of the first degree to be found in any portion of the Commonwealth's testimony ?   If so, the power and duty of the court, under the Act of 15th February 1870, is at an end.   Any reasonable doubts which may have sprung from the defendant's testimony have already been passed upon by the jury. They cannot be raised here: Grant *v.* Commonwealth, 21 P. F. Smith 507 ; Staup *v.* Commonwealth, 24 Id. 458.

Chief Justice AGNEW delivered the opinion of the court, March 26th 1877.

Upon the indisputable evidence in this case the verdict was correct.   These are the leading facts.   Andrew Lanahan, the prisoner, and John Reilly, Esq., the deceased, were at a saloon under Landmesser's Hall, in Wilkesbarre, on the afternoon of the 15th of September 1874.   They had not gone there together, but were drawn thither by a political convention held in the hall above.   Late in the evening, Lanahan invited Reilly to take a seat in his buggy to go home.   They left the saloon about dark, Lanahan sitting on the right and Reilly on the left side ; Lanahan driving down Main street.   When between two and three hundred yards from the saloon, and still in the built up part of Main street, a witness on the sidewalk heard two shots in pretty quick succession, and saw two flashes proceeding from the buggy, and immediately heard a voice coming from the buggy saying : " You have shot me," or " I am shot."   The direction of both flashes was from the right towards the left side.   Immediately a man's body slipped from the seat, and his legs hung out at the left side, dangling against the wheel, and continued thus for a short time until the buggy approached Hazel street, the vehicle going at great speed.   Before the firing no voices were heard, or other evidence of a quarrel in the buggy. When crossing the railroad track into Hazel street, the buggy was

held up and crossed slowly. Just after turning into Hazel street, a witness saw two men in the buggy, one on the left, apparently lying with his head against the shoulder of the other on the right side, who held the reins and whip in his right hand, and was pulling a blanket over the man on the left. The buggy was soon driven at great speed, the driver striking the horse rapidly with the whip in his right hand. At the Newtown bridge, at a considerable distance from Wilkesbarre, two double teams were about crossing, and the front driver hallooed to the one behind to "hurry up, there was a 'rig' coming pretty fast to cross the bridge." The hindmost driver whipped his horses, but was not quite across when the "rig" struck his barouche, the front wheel of the former locking into the hind wheel of the latter. The driver of the "rig" whipped his horse rapidly to get loose, the driver of the barouche hallooing "whoa," and three times telling the other to stop, and he would help him, the other saying nothing. Both got out about the same time, the driver of the barouche running down to the head of the horse in the "rig" and the driver of the latter immediately turning from him, and running around the horses of the barouche, and then up the railroad towards Newtown. The driver of the barouche called to a woman to bring a light, and stooping down discovered a man lying under the wheel, but his horses being restive started, and he ran to catch them, got on his box and drove on to the city. The woman and others coming, the man under the broken "rig" was discovered to be 'Squire Reilly, and the "rig" afterwards identified as the buggy Lanahan had hired, and drove from the saloon with Reilly in. In a few minutes after the collision at the bridge Lanahan was met by a woman, who knew him, going rapidly into Newtown and breathing very hard. He reached home between eight and nine o'clock, and on the same night sent a companion for a doctor to extract a ball from his body. His vest and coat were burned as if by powder. One of his companions felt a ball in his flesh under his arm. The doctor did not come, and the next thing known of the prisoner was on the following night when a companion, who says he owed him twenty dollars, found him in the woods beside a rock or bushes, gave him the money, and told him the people were excited and would hang him, if caught.

Lanahan disappeared, and was not found until about a year afterwards, when he was discovered in a western state, under a feigned name, arrested and brought back, denying his identity and not admitting it until fully identified at Wilkesbarre. Reilly, the deceased, was not known to have possessed a pistol, and none was found upon him, or in the buggy, or on the road the buggy ran, or elsewhere. The identity of the two persons, the buggy and horse, and of the time, place and circumstances of the shooting being undeniable, the chief and indeed only possible defence was that a quarrel must have arisen between them, that each had a pistol, and

that in and about the same time they fired upon each other. This raises an inquiry into the probability of such a quarrel under the circumstances. The testimony of the witness on the pavement, and close by whom the shots were fired, contradicts the probability of a quarrel. The relative positions of the parties make it still more improbable. Lanahan sat on the right side and Reilly on the left—this fact is beyond dispute. The ball which killed Reilly entered the muscle of his right arm, passed into his right side, diagonally upward through the lungs and auricles of the heart, and out at his left shoulder blade. This makes it clear that they were sitting side by side when the shot was fired, and not facing each other. If facing, Lanahan's right hand would have been opposite Reilly's left side, and the ball would have taken a contrary direction. The absence of noise or quarrel, and the direction of the ball through Reilly, show plainly that Lanahan held the pistol in the dark, with his right hand, the bend of his elbow giving it a direction slightly upwards and inwards, and near to the forepart of Reilly's right arm, thus causing the ball to take the precise direction it did. The course of the ball which wounded Lanahan confirms this conclusion with great force. It entered his left breast near the nipple, striking and passing the rib under the left arm and lodging in the flesh under the arm pit. This wound could not have been from a pistol in the hand of Reilly. To have made it, he must have been facing Lanahan, holding the pistol in his left hand, or must have reached around Lanahan with his right. But the first shot from Lanahan's pistol having been fired when sitting together, and passing through Reilly from right to left, the second shot was naturally turned into Lanahan's own body precisely in the direction the ball took, by a movement of Reilly, either in the convulsion of death, by striking Lanahan's pistol with his arm, or by a momentary attempt before death to grasp the pistol; the shots being in quick succession, and negativing the idea of a return shot by Reilly. All doubt of this is removed by the witness on the pavement, who heard the shots quickly following each other, and saw the flashes proceeding from the right to the left. Had Reilly fired, it is probable his body would have hidden the flash from his pistol, or the flash would have been seen going from left to right. This solution is made still more clear by the subsequent facts. Immediately the man on the left side is seen to slide from his seat, and his legs fall out against the wheel. Then came Lanahan's effort to retain the body, and the apparent position of Reilly afterwards, as if leaning against his shoulder, and his effort to draw the blanket or cover over Reilly. This was followed by the rapid driving, the collision at the bridge, Lanahan's silence when spoken to three times, his leaving the buggy, his running toward home, his concealment in the woods, his final flight, assumed name, and denial of his identity. Flight it is argued is no evidence of the degree of murder; but flight under the cir-

[Lanahan v. Commonwealth.]

cumstances detailed, gives them strength, and they indicate the degree. The prisoner evidently shot Reilly intentionally, by deliberately holding a deadly weapon against his side and firing the ball directly through the most vital organs of his body, without a quarrel. It is asked what was the motive? True, this is not yet solved, but the fact of a deliberate and intentional killing is there. The fact of murder being established, the inability to discover the motive does not disprove the crime. When the question is, whether the prisoner committed the crime, his motive may be a most important fact in the proof, but the crime being established it is well shown in McCue v. The Commonwealth, 28 P. F. Smith 190, that the hidden motive is unnecessary to be disclosed.

The verdict of the jury establishes the murder in the first degree. Was the evidence sufficient? Did it contain the ingredients? The burden of this proof, it is admitted, lies on the Commonwealth. But it is not necessary that the evidence should be express; it is sufficient, if from the nature and use of the weapon, and the acts and conduct of the prisoner, his intention to kill can be fully, fairly and justly inferred, with so much time used and opportunity for deliberation, as to convince that his purpose was wilful and premeditated. If the doctrine were otherwise secret murders would rarely be punished. This doctrine was held by the courts immediately after the passage of the Act of 1794, and has been announced in numerous decisions down to the present hour. The case of Mulatto Bob was tried before Chief Justice McKean and Justice Smith in 1795. The Chief Justice said, "Although premeditation is necessary under the act, still the intention remains as much as ever the true criterion of crime, and the intention can only be collected from the prisoner's words and actions: but let it be supposed that a man without uttering a word should strike another on the head with an axe, it must on every principle by which we can judge of human actions be deemed a premeditated violence:" 7 Sm. Laws, Appendix.

This doctrine was re-stated by Chief Justice McKean in O'Hara's case, tried in 1796. It was also held by Judge Rush in Dougherty's case, tried in 1807, and in Smith's case in 1816: 7 Sm. Laws, Appendix. In the case of Kilpatrick, Judge Ludlow substantially repeated the language of Judge Rush and his charge was approved by this court in 7 Casey 198.

In Cathcart v. Commonwealth, 1 Wright 108, Justice Strong reiterates the presumptions to be drawn from the use of a deadly weapon. He says, " If the killing were not accidental, then malice and a design to kill were to be presumed from the use of a deadly weapon ; for the law adopts the common and rational belief that a man intends the usual, immediate and natural consequences of his voluntary act."

It is supposed that the case of Kelly v. The Commonwealth, 1

Grant 484, somewhat modifies the doctrine as to the presumption to be drawn from a voluntary use of a *deadly* weapon in taking life. But this is a great mistake. The learned justice who delivered the opinion in that case made no departure from the ancient doctrine, but he wisely and properly made a most just discrimination, arising out of the very case before him. There some young men who had been drinking entered the house of an old man for the purpose of soliciting the chastity of his daughter. Father and daughter slept together. The father jumped out of bed, and got into a scuffle. The daughter jumped out and seizing a bar of iron struck the one engaged with her father. They left the room, but soon returned, and another scuffle ensued. The daughter, having given her father the bar of iron to defend himself, fled. She returned shortly with assistance and found her father alone on the floor with his skull fractured. The girl was a prostitute and Kelly had visited her before. · No one saw the blow struck, but it was evident that the iron bar must have been wrested from the old man in the scuffle, and the blow inflicted which resulted in his death. A point was put that if the prisoner was strongly under the influence of liquor, and in the excitement and tumult that ensued the iron bar was suddenly caught up and the blow inflicted, the murder was not in the first degree, but in the second. This the court answered in a very indirect and somewhat confused manner, mingling with it an attempt to commit a rape, and the law arising out of such an attempt. The facts necessarily led Justice THOMPSON to state the presumption arising from the use of an instrument merely likely to kill, in the absence of evidence of an intention to kill. In such case it would be only murder in the second degree. The key to his meaning is found in this sentence, which immediately follows : "More (he says) is necessary than a blow with an instrument likely to kill, to constitute murder of the first degree; there must be intention, deliberation and premeditation found ; and the instrument is evidence on this point. If this do not appear the use of an instrument in a sudden quarrel, although likely to kill, and a killing ensues, leaves the grade of the crime the second degree."

When we consider that the instrument about which he was reasoning was an iron bar, an instrument which may kill; but yet is not what is termed a deadly weapon—a weapon intended to kill— such as a gun or a pistol, we perceive at once his meaning; that is, that more than the mere blow with such an instrument, and death ensuing, or the catastrophe, as he terms it, are necessary to be shown. The intention to kill must also exist, and on this point the instrument, he says, is evidence. It is clear, therefore, it was not in his mind for a moment to question, much less deny, the ancient, well-settled doctrine, that the use of a *deadly* weapon, such as a *pistol* or *gun*, a *deadly* instrument, such as an *axe*, when voluntarily directed against a mortal part, is evidence from which a jury

[Lanahan v. Commonwealth.]

may rationally infer an intention to kill, when the conduct of the prisoner and the circumstances under which he fires the gun or gives the fatal blow corroborate and sustain the inference. The language of Judge STRONG, in Cathcart v. Taylor, *supra*, which was decided two years later, and from which Justice THOMPSON did not dissent, strikes the very point of the old doctrine. "Human reason," he says, "will not tolerate the denial that a man who intentionally, not accidentally, fires a musket ball through the body of his wife, and thus inflicts a mortal wound, has a heart fatally bent on mischief and intends to kill." The doctrine was stated with great care in The Commonwealth v. Drum, 8 P. F. Smith 16, 17. This is the opinion of a single judge, but I may say that before the charge was permitted to be published, it was submitted to Chief Justice THOMPSON, who, after a most careful examination, gave it his entire concurrence and recommended its publication. Great care was also taken in Drum's case to prevent the general language in Smith's case and others, as to the shortness of time in which an intention to kill may be formed, from misleading in cases of doubt; and it was said : " It is true that such is the swiftness of human thought, no time is so short in which a wicked man may not form a design to kill, and frame the means of executing his purpose; yet this suddenness is opposed to premeditation, and a jury must be well convinced upon the evidence that there was time to deliberate and premeditate. The law regards, and the jury must find, the actual intent; that is to say, the fully formed purpose to kill, with so much time for deliberation and premeditation, as to convince them that this purpose is not the immediate offspring of rashness and impetuous temper, and that the mind has become fully conscious of its own design." In regard to the evidence this was said, and is directly applicable to the case before us : " The proof of the intention to kill and of the disposition of mind constituting murder in the first degree, under the Act of Assembly, lies on the Commonwealth. But this proof need not be express or positive. It may be inferred from the circumstances. If, from all the facts attending the killing, the jury can reasonably and satisfactorily infer the intention to kill and the malice of heart with which it was done, they will be warranted in so doing. He who uses upon the body of another, at some vital part, with a manifest intention to use it upon him, a deadly weapon, as an axe, a gun, a knife or a pistol, must, in the absence of qualifying facts, be presumed to know that his blow is likely to kill, and, knowing this, must be presumed to intend the death which is the probable and ordinary consequence of such an act." This language was used by brother STERRETT, when in the Oyer and Terminer of Allegheny county, and affirmed by this court in Lynch v. The Commonwealth, 27 P. F. Smith 207. The doctrine we have been discussing was again affirmed in McCue v. Commonwealth, 28 P. F. Smith 185.

These principles, applied to the case before us, leave no doubt that the ingredients of murder in the first degree existed in the evidence. A man riding with another, under the cover of darkness, and without a quarrel, who deliberately holds a pistol against his side, and without warning fires a bullet through his lungs and heart, can on no principle of right reason or good sense be said not to intend, deliberately and premeditatedly, to kill.

None of the assignments of error are supported, and the sentence of the court is therefore affirmed, and the record is ordered to be remitted for the purpose of carrying the sentence into execution.