Commonwealth *v.* Mehlman, Appellant.

Argued November 15, 1948. Before RHODES, P. J., HIRT, RENO, DITHRICH, ROSS, ARNOLD and FINE, JJ.

*Harry A. Estep*, with him *Harry I. Glick*, for appellant.

*Wm. F. Cercone*, Assistant District Attorney, with him *William S. Rahauser*, District Attorney, for appellee.

OPINION BY ARNOLD, J., January 14, 1949:

Defendant appeals from a conviction of perjury. He lived in the City of McKeesport and was charged in four separate bills of indictment with perjury, in swearing falsely as to his ownership of real estate in justifications of surety in connection with recognizances which he executed, in the following criminal cases:

(1) On January 9, 1948, for appearance of Sylvan Tannebaum at a preliminary hearing on January 10. Bail $2,500.[1]

---

[1] Indictment 403 February SS 1948.

(2) On January 10, 1948, for appearance of Charles Donnell at a preliminary hearing on January 12. Bail $2,500.[2]

(3) On January 10, 1948, for the appearance of Ernest Moore at a preliminary hearing on January 12. Bail $2,500.[3]

(4) The present case in which, on January 25, 1948, (Sunday) defendant became surety in the sum of $5,000 for the appearance of Owen M. Halleron at the next court of quarter sessions.[4] Halleron had been committed for trial in default of bail on charges of extortion or blackmail,[5] and Mehlman appeared before the committing magistrate and signed and swore to a formal written justification of surety.

All four indictments were tried together without objection and the jury found him guilty as to each charge. The court refused defendant's motions as to the Halleron case, and sentenced. The court discharged defendant on the other three indictments because the Commonwealth failed to show beyond a reasonable doubt that Mehlman had been sworn to the justification of surety in those three cases. But in those cases there was ample evidence that he *had made* the statements which were false.

Appellant contends: That the testimony of the Commonwealth was insufficient to establish guilt, and that the defendant acted honestly in reliance upon the advice of counsel in his affidavit.

Mehlman admitted that he made affidavit that the facts stated in the justification of surety were true. The justification was a printed form containing blanks which were filled in by the alderman from the informa-

[2] Indictment 404 February SS 1948.

[3] Indictment 405 February SS 1948.

[4] Indictment 402 February SS 1948.

[5] Conviction affirmed by this Court in opinion handed down this day.

tion given him by Mehlman. Mehlman did not deny that he gave the information which appeared therein. The justification of surety thus sworn to, inter alia, set forth (the words underlined having been inserted by the magistrate at the instance of Mehlman):

"2. I am the owner of real estate in said COUNTY OF ALLEGHENY, [consisting of] . . . a lot of ground . . . 60 x 120 situate at Cor. 4th & Grant in the City of Duquesne which is improved with . . . three story Brick Building."

"3. The said property was obtained by me by Deed . . . from             in the year 1946, the title is in my own name alone, and the Deed . . . is recorded in Allegheny County, Vol. —— Page ——." [6]

"6. The only incumbrances upon said premises are $15000.00 Mortgage."

"7. The above described property is assessed by the County . . . in the sum of $32000.00, and I believe that it would sell for that amount, and it is rented for $6500.00 per annum."

"8. I have carefully read over the foregoing affidavit and know that it is correct."

Therefore defendant stated under oath that he was the *owner* of a three-story brick building in the City of Duquesne of the assessed value of $32,000, and a rental value of $6,500 per year, and that *"the title is in my own name alone."* (Italics supplied.)

The magistrate testified that the defendant said that he couldn't give the volume and page number where "the title . . . in my own name alone" was recorded, and upon being asked for the deed, said that he "would bring the deed in . . . the next morning [Monday]." This Mehlman did not deny. On the next morning Mehlman did not bring in the deed, but instead appeared with one Tuckfelt, who gave $5,000 cash bail and executed

---

[6] Mehlman denied that this statement was read to him or that he read it.

a new recognizance for Halleron, and the Mehlman recognizance was then withdrawn or cancelled.

· The Commonwealth showed that the Duquesne property was conveyed to Max Mehlman and Robert Skolsky by deed February 26, 1946, and that on November 1, 1947, Mehlman, a single man, conveyed his undivided one-half interest [7] to Robert Skolsky. Therefore at the time the recognizance was given the entire title to the Duquesne property was vested in Robert Skolsky, as appeared from the deeds on record. Mehlman's contention was that he retained "an equitable interest" in the one-half undivided interest, and that the record title was placed in Skolsky's name so that the property might be easily conveyed if Mehlman were absent. The only evidence that the defendant retained any interest was oral.

The sergeant of county detectives testified that after Mehlman's arrest for perjury in the Halleron recognizance, Mehlman was asked: "You didn't have the title [to the Duquesne property] before or after you put up the bond?", and he replied, "No, sir." He was then asked: "What was [the] purpose in turning this property over [to Skolsky]?", and he answered that "[I] needed the money for that government case and that was [my] purpose in turning that property over." Mehlman was also asked whether he had used the Duquesne property as security in other recognizances, and replied: "Not that I can remember. Any other time I put up a bond I used cashier's checks." The Commonwealth also proved that he became surety on the three recognizances concerning Tannebaum, Donnell and Moore, signed by the defendant on January 9, 1948, January 10, 1948, and January 10, 1948, respectively, only two weeks before the Halleron recognizance, and only twenty days before his arrest. In each of these recognizances he offered the whole title to the real estate as the security and did *not* offer cash bail.

---

[7] Deed recorded November 12, 1947.

Defendant denied no part of the Commonwealth's evidence except making the oral statements to the sergeant of county detectives, and making the statements in connection with item 3 of the justification. He denied that he read item 8.

The defense was that in spite of the unqualified deed to Skolsky he retained the one-half undivided interest in the very property conveyed. But this deed set forth: "The purpose of this deed being to vest the entire estate there granted in Robert Skolsky, grantee herein." Mehlman was corroborated by Skolsky, and to a degree by the attorney who drew the deed. This testimony was oral,—which the jury was not bound to believe. It had a right to consider that the normal way for Mehlman to arrange for the sale without his signature, would be to give a power of attorney. Mehlman was not unacquainted with business. In addition Skolsky admitted that after he received the deed from Mehlman he became, on February 10, 1948, surety on the recognizance of Ferd Smith in a criminal case, and in his justification of surety had stated the value of the *whole* property and the amount of the whole encumbrance, and did not state that he owned only a half interest. Likewise he admitted that on January 27, 1948, he became surety for Sylvan Tannebaum in a criminal case in the sum of $2,500. This was the same Tannebaum for whom Mehlman had become surety on another recognizance on January 9 (indictment No. 403 in the trial). When Mehlman became surety for Tannebaum the whole interest in the Duquesne property was declared to be owned by him. While both Mehlman and Skolsky testified that neither owned the entire interest, yet in the six recognizances under consideration neither stated that he was the owner of but a one-half undivided interest. Thus it was plain that both Skolsky and Mehlman operated in the field of becoming surety on recognizances in criminal cases, and that each of them repre-

sented that he was the sole owner of the Duquesne property.

In addition, the deed from Mehlman to Skolsky had affixed to it United States documentary internal revenue stamps in the amount of $4.40. The attorney who drew the deed testified for the defendant. He stated that the amount of the revenue stamps was suggested by Mehlman and Skolsky, but that the stamps were affixed "For no good reason at all." Neither Skolsky nor Mehlman denied or explained these facts. But in March, 1948, after the alleged perjuries, the same attorney prepared a deed from Skolsky to Mehlman for a one-half undivided interest, to which no revenue stamps were affixed. Not only was the allegation of equitable ownership in a one-half undivided interest not required to be believed by the jury, but in addition it did not meet or explain defendant's statement, under oath, that the title was in his name alone.

Mehlman and Skolsky both testified that in the evening of the day Mehlman signed the Halleron recognizance, Skolsky complained bitterly to Mehlman: "You'll tie up the property so we can't sell it"; that Mehlman should not have signed it, and that it was for *this* reason that Tuckfelt gave cash bond to replace the Mehlman recognizance. This was evidently an explanation of why Mehlman did not produce his deed on Monday morning as he had promised. This testimony of Skolsky and Mehlman could scarcely have been credited by anyone. Skolsky had executed recognizances for Tannebaum and Smith on January 27 and February 10, respectively, *after* the Halleron recognizance. These were as effective to tie up the property as was the Halleron bail. There was no complaint by either Mehlman or Skolsky to the execution of the Donnell, Tannebaum and Moore recognizances (by Mehlman), or the Tannebaum and Smith recognizances (by Skolsky). Each of the recognizances signed by Skolsky, as well as all the recognizances signed by Mehlman, contained a clause

permitting confession of judgment against the surety on forfeiture. Any recognizance signed by either might tie up the property, but as to any judgments thereon entered against the defendant, Mehlman, the Commonwealth could not collect the same unless Skolsky would testify that Mehlman retained a one-half interest,—which may well be doubted.

The defense that Mehlman acted on the advice of counsel was not established to the satisfaction of the jury or the court. The attorney did testify that Mehlman asked if he could become surety under the situation in which the deed to the property was. But Mehlman did not seek his advice as to becoming surety on the three earlier recognizances. The attorney asked Mehlman if he was sure he owned the one-half "equitable" interest. When Mehlman replied that he did, the attorney said that he could go on the bail bond. The attorney also testified that he knew that one did not have to own *any* real estate in order to become surety on a recognizance. In any event the advice of the attorney was as to the ownership of an alleged "equitable" one-half interest. The declarations in the justification of surety were as to the whole title. Again, this testimony was oral,—the jury was not bound to believe either the attorney or his client.

It was argued that the Commonwealth established no motive for Mehlman's perjury. We think there was evidence of motive. Both Skolsky and Mehlman were helping people charged with crime, and this in some form redounded to their benefit. What that benefit was did not appear, but that each of them had a motive cannot be denied. Independently of this, however, the Supreme Court said in a capital case: "It is urged as a reason for the reversal . . . that no motive was disclosed for the crime charged. . . . Though the evidence against . . . [the defendant] was circumstantial, if it satisfied the jury of her guilt, she is not to be saved from the consequences of her crime because a motive for its

commission . . . had not been disclosed. There can be no escape from punishment for crime when all the elements of it are proved, whether the evidence be positive or circumstantial, simply because the motive lies hidden in the heart of the only one who knows it.": *Commonwealth v. Danz,* 211 Pa. 507, 60 A. 1070, quoted by Chief Justice MAXEY in *Commonwealth v. Westwood,* 324 Pa. 289, 305, 188 A. 304. See also *McCue v. Commonwealth,* 78 Pa. 185;[8] and *Lanahan v. Commonwealth,* 84 Pa. 80.[9]

The testimony closed in the afternoon, and the next morning after the jury were seated and before the charge, counsel for the defendant addressed the court, stating that an article appeared in that morning's Pittsburgh newspaper which had a headline in big letters: "All in good faith, says racketeer [meaning Mehlman]." The first paragraph of the same article stated: "Max Mehlman, McKeesport numbers baron, insisted Tuesday he acted in good faith when he 'went bond' illegally for his friend, Owen M. Halleron, convicted blackmailer." (The last sentence refers to the verdict of guilty against Halleron the preceding week.) Counsel then stated in the presence of the jury: ". . . there being no evidence in this case in connection with him being a racketeer . . . except as to this indictment . . . I request the Court to charge the jury and call their attention to such facts in his charge as will cover that situation [that there was no evidence of other violations]." The vice of the article consisted in referring to the defendant as "a racketeer" and as a "numbers

---

[8] "The motive may be obscure, indeed may not be fathomed; . . . The ingredients of the crime of murder in the first degree were all there, however inscrutable may be the causes which moved the prisoner to commit the deed . . . [and] retribution cannot be avoided, because the motive lies hidden and unrevealed in the heart of him only, who could disclose it."

[9] "It is asked what was the motive? True, this is not yet solved, but the fact of a deliberate and intentional killing is there . . . [and] the inability to discover the motive does not disprove the crime . . . [and] the hidden motive is unnecessary to be disclosed."

baron." The defendant's counsel did not want a juror withdrawn or he would have made such a motion. The court asked if counsel wanted the jurors interrogated as to having seen the article. Counsel having so requested, the jurors were thus questioned. One juror so indicated. Another juror said that he had only read the names of jurors in the McKeesport morning paper, and that there had been a small item in "last night's" Pittsburgh Press, but he had not read the morning Pittsburgh paper. Still another juror stated that he had just read the names. The jurors were directed to give up "either the Post-Gazette or any other paper that has any reference to this case." The papers were handed to the court officer. The court asked whether counsel desired anything to be said to the jury as to the contents of the newspapers. Counsel replied, "No." The court then asked: "Do you withdraw your request [for a charge that there was no evidence of other violations]?", and counsel replied, "Since the answer comes as it does, yes."

It is now argued, that to say that the jurors "had not been unfavorably prejudiced . . . is futile, unreasonable and is beyond the understanding of human nature." But counsel cannot stand by with full knowledge and take a chance on a verdict, and after an adverse verdict demand a new trial. The appellant states that counsel had not seen the article published in the Daily News of McKeesport, and it is now averred that that paper stated: "Max Mehlman, McKeesport 'numbers' man, went on trial for perjury today in Criminal Court," and, "Attorney Harry Estep is defending the 'numbers' operator." Any prejudice from the Post-Gazette article consisted in calling defendant a "racketeer" and "numbers baron." The McKeesport paper referred to him as a "numbers man" and as a "numbers operator." Since the defendant was satisfied to have the jury make up a verdict with full knowledge that some of them had seen the Post-Gazette article, the defendant has no just com-

plaint as to the McKeesport newspaper which only called him the same thing. In addition, one of the jurors stated that he had read the morning paper of McKeesport. Insinuation is made that some one antagonistic to defendant "planted" the McKeesport paper with the jury, since no one of them lived in McKeesport. Passing by the fact that nothing in the record shows the residences of the jurors, it is difficult to assign any reason to "plant" McKeesport papers with a jury of non-residents of that city, particularly when the jury had free access to the morning Pittsburgh paper, which was fully as drastic in its characterization of the defendant as was the McKeesport paper.

The appellant criticises the trial judge, stating that he ought to have known that it would be impossible for the appellant to have received a fair and impartial trial (though apparently counsel thought he could), and asserts *that the court, of its own motion, without the request of counsel,* should have withdrawn a juror and declared a mistrial. It is improper for a trial judge "of his own motion" to withdraw a juror because of some prejudice *to the defendant,* who is entitled to be tried by the jury which he had helped to select. If the jury is to be discharged, it ought only to be on the defendant's motion if the prejudice is against the defendant. The only proper practice is for the court to ask counsel for the defendant if the withdrawal of a juror is desired. If defendant's counsel answers, "No," that should be an end of it. It would have been nearly presumptuous for the court to undertake to advise the able and experienced counsel.

We find no merit in the allegation that the trial judge laid particular stress upon the testimony of the Commonwealth, and minimized that of the defense. The court's review was fair and was complete. At its close the court asked whether there were any requests for corrections or additional charge, and counsel for the defendant specifically suggested four matters. The court

asked defendant's counsel: "Is that sufficient?", and the answer was "Yes." The matter now contended for by counsel cannot be raised under a general exception.

Lastly, it is asserted that the court refused to sustain the demurrers to the Moore, Donnell and Tannebaum indictments, and that therefore the jury considered the testimony on these together with the Halleron case, to the prejudice of the defendant, though thereafter the court set aside the verdicts or arrested judgment in those three cases. In view of the defense presented that Mehlman owned an "equitable" one-half undivided interest in the Duquesne property, and signed the recognizance of Halleron *on the advice of an attorney,* all of the testimony concerning the other recognizances was relevant to the Halleron indictment, for the defendant admittedly executed these without the advice of an attorney. It was relevant also as bearing on the defendant's lack of good faith, which was the principal assertion in his behalf. In any event, it would be extraordinary to reverse a proper conviction such as this, merely because the court did not sustain demurrers but did arrest judgments in companion cases tried before the same jury. It might as well be argued that if, in any companion case, the Commonwealth's evidence fails, a defendant must be given a new trial if a verdict of guilty is reached in the associated indictment. The defendant received an entirely fair trial before an able and impartial judge, whose refusal of a new trial ought not to be disturbed.

The assignments of error are overruled, the judgment of the court below is affirmed, and the defendant, Max Mehlman, is directed to appear in the court below at such time as he may be there called, and that he be by that court committed until he has complied with his sentence or any part of it that had not been performed at the time the appeal was made a supersedeas.