## Grant *versus* The Commonwealth.

1. Under the Act of February 15th 1870, allowing writs of error as of right in cases of homicide, the Supreme Court will not consider the case as on a motion for a new trial.

2. On a motion for a new trial the court considers the testimony on both sides, and judges whether the jury have given undue weight to either side under all the circumstances of the case as presented to them.

3. The duty of the Supreme Court under the act is to see whether there was evidence which if believed by the jury would furnish the elements of murder in the first degree.

4. If there be in the evidence ingredients to constitute murder in the first degree, the power of the Supreme Court as to awarding a new trial ceases.

5. Under the Act of 1870, errors alleged to any portion of the charge or rulings on evidence can be brought before the Supreme Court only by bill of exception as in civil cases: and the court cannot reverse unless the exception be taken at the trial.

6. In this respect the Act of 1870 does not alter or supply the Criminal Code of March 31st 1860.

7. The Act of 1870 dispenses with a bill of exceptions only so far as to ascertain whether the facts constitute murder in the first degree.

8. Hopkins *v.* Commonwealth, 14 Wright 9, followed; Schoeppe *v.* Commonwealth, 15 P. F. Smith 51, remarked on.

May 27th 1872. (At Harrisburg.) Before THOMPSON, C. J., READ, AGNEW, SHARSWOOD and WILLIAMS, JJ.

Error to the Court of Oyer and Terminer of *Chester county:* (Eastern District.) Of July Term, 1872.

George Grant was, at the October Sessions of the Court of Oyer and Terminer of Chester county, indicted for the murder of Amanda R. Spence.

The trial was had November 1st 1871, before Butler, P. J., and his associates.

On the 5th of October 1871, between 8 and 9 o'clock in the evening, Mrs. Spence went from her kitchen into her yard; shortly afterwards the report of a firearm was heard and persons going out found her lying by the door dead, with three gunshot wounds on her, sufficient to cause death. It was conceded on the trial by all parties that she had been wilfully murdered. The only question raised on the trial was whether George Grant, the defendant, had perpetrated the crime.

Much evidence was given by the Commonwealth to show that Grant was the murderer. Amongst other evidence, witnesses for the Commonwealth under objection and exception testified as follows :—

James Spence : " I saw George Grant after the murder in front of saloon; some one spoke up and said : 'they have arrested Burrell ;' he remained ten or fifteen minutes; he stayed in all the evening; he said to me, ' if you need any assistance call on me ;' he seemed uneasy, and was walking about; he stayed off and on all night;

21 P. F. SMITH—32

[Grant *v.* Commonwealth.]

George Grant married my cousin; mother raised her; I remember one time George was in jail and his wife was sick, and had a child born, and mother took her home, and interfered to prevent her returning to him; it was between ten and eleven o'clock; it was stated in Grant's presence that Burrell was arrested."

On cross-examination witness said: "It was three, or four, or five years ago, that mother wanted his wife to leave him; she didn't leave him; he came in the shop sometimes."

Eliza Davis: "I saw Grant the night of the murder; I was standing on the street near the mansion-house; he was going down towards where his wife lives; I stood there several minutes; I remained until it struck eight o'clock, and as I passed up towards Smith's store soon after Grant passed me, talking to himself; swinging his hat in his hand, gnashing his teeth and said, 'the damn black bitch, I'll match her before to-morrow morning's sunrise,' and called nobody's name; he was going north; it had struck eight o'clock, but was not much after; I went to Henry S. Evans's and stayed, probably, three-quarters of an hour; he was talking about Mrs. Spence two years ago; he was talking to my mother-in-law; he said he married Mrs. Spence's niece, but the damned old bitch is always trying to put disturbance in her head, and persuade her not to come back to me, and that he intended to kill her; that he had watched for one night, and it was so cold that he froze his feet; I said, the next time you may freeze yourself to death; he said he didn't care a damn where his soul went, he intended to kill her; I said if ever this happens I will tell the truth; he said he would kill her and didn't care what they did with him; my mother-in-law and sister-in-law were present; both are dead; Isaac came in during the time."

On cross-examination witness said: "He commenced by saying there was a misunderstanding between him and his wife, and that Mrs. Spence took it up; Grant passed close to me."

Isaac Davis: "About two years ago I went to my mother's, and found my wife, mother and sister there, and I heard George Grant say he would kill her or shoot her; can't say whether he mentioned Mrs. Spence's name or not; but it was mentioned; the conversation was in progress when I came in; I was in but five or ten minutes; my brother-in-law was up stairs and I went up; my wife came to Henry S. Evans's between half-past eight and nine o'clock; the clock struck nine while she was there; it was the same night of the murder."

The decision of this case by the Supreme Court involved the construction of the Act of February 15th 1870 (Pamph. L. 16, 1 Br. Purd. 610, pl. 38, 39), as to the extent to which the Supreme Court may review and pass upon the evidence in cases of homicide. It is therefore necessary to present most of the charge to

[Grant *v.* Commonwealth.]

the jury; this, with the opinion of the Supreme Court, contains a synopsis of the evidence and will sufficiently exhibit the case.

Judge Butler charged : * * *

"But who did perpetrate the murder ? This is the grave question which the case presents. No one, save the perpetrator himself, witnessed it ; and, there is, therefore, no direct or positive evidence to be appealed to. Indeed where wilful and deliberate murder—contemplated for any considerable time beforehand—is committed, it rarely occurs that direct or positive proof, in respect to it, exists. Perpetrated, as such murder usually is, by lying in wait for the victim, or by means of poison, the only evidence in relation to it must commonly be found in the circumstances attending it. And this character of testimony is found, as well by experience, as by reason, to be little, if any, less satisfactory and certain than direct or positive evidence. Where the circumstances relied upon are properly established, and the inferences arising from each one, and from all of them combined, point naturally and unequivocally in one direction, there is no greater danger in following them to their conclusion, than attends all human investigation. That we may err in such cases is possible—but so we may where the evidence is direct or positive—the circumstances may, possibly, mislead, but so may the eyes, or the ears, or the dishonesty of witnesses.

"Turning again to the evidence, we find Mrs. Spence at the door, dead. We find wounds upon her body apparently made by rifle or pistol balls; we also find the balls; and without more, none of us hesitate to draw the inference that she was killed by a firearm of some description ; but this is rendered, if possible, more conclusive by the circumstance that the report of a firearm was heard immediately before. Thus is one fact established.

"Then, upon examination of the ground in the vicinity, a firearm is found, half hidden in the grass and shrubbery, within a few feet of where she lay. It is extraordinary in its character, apparently an army rifle or musket cut down in the barrel and stock, capable of receiving and sustaining a heavy charge. It is empty, and, as the witnesses say, appears to have been recently discharged—burned powder is in the muzzle, and an exploded cap, still bright, is on the tube. These circumstances, considered with the fact that the report heard was extraordinarily loud, that three balls were discharged, and one driven entirely through the body, do not leave the mind in doubt that it was with this firearm the crime was committed. The prisoner's counsel admit this to be so.

"Then, whose firearm was this, and who left it in the yard ?

"One witness tells us that he sold it to the prisoner, some years ago, that he is familiar with it, and knows this to be the same. Other witnesses tell us that they have seen it, from time to time, in his possession. One of them says he identifies it by the cutting out of the groove made for the ramrod, and the tacks in the end

[Grant *v.* Commonwealth.]

of the stock.   If this testimony is believed—and it is not contradicted or impeached—it cannot be doubted that this firearm, with which the crime was committed, belonged to the prisoner.

" This of itself, however, would be insufficient to warrant the conclusion that *he* used it on the occasion in question.   It might excite strong suspicion—pointing in the direction, as it does, of his guilt—but standing alone would be too uncertain to justify conviction.

" Upon further examination of the ground where Mrs. Spence lay, a piece of calico is found, as the witnesses inform us.   It is blackened, and has upon it the odor of gunpowder.   You will judge whether this was, or was not, the wadding used in the charge with which she was killed.   Other pieces of calico, of similar pattern and manufacture, are produced, which the witnesses inform us were found in the prisoner's house, the day following the murder, some of them in a drawer with balls and percussion caps.   From this latter circumstance the Commonwealth asks you to infer that the charge with which Mrs. Spence was killed was placed in the pistol at the prisoner's house, or from his ammunition.   It is in evidence, however, that goods of the same pattern and material as the supposed wad, are sold from one of the stores of this town. You will judge whether it is safe to infer that the pistol was loaded at the prisoner's house or from his ammunition.   This question does not, however, strike us as of very great importance, inasmuch as, if the ammunition is found to have been his, the case of the Commonwealth is not advanced by it a step beyond the point to which the inference arising from his ownership of the pistol has carried us.   The inference from this fact—the ownership of the pistol (if it were his),—as we have before remarked, would of itself be insufficient to warrant the conclusion that *he* used it on the occasion of the murder.   And the result would be the same if the ammunition with which it was loaded, was also shown to be his. He might have parted with the possession of the pistol, as he alleges, shortly previous to the commission of the crime (and if he did so it would be as likely to be loaded with his ammunition as not).   Still, as we have before observed, the inference from his ownership would be strongly against him, exciting suspicion and calling for explanation.   The prisoner evidently saw and felt this to be so ; and therefore declared, when before the magistrate, Mr. Hibbard, the day after the murder, that he had parted with his pistol three weeks before that time—that he lost it on the Fair ground.   If this explanation is untrue, it adds greatly to the force of the inference against him.   Is it untrue ?   One witness, Spriggs, tells you that he saw the pistol in the prisoner's possession on the 25th of September, ten days only before the murder.   Another witness, Proctor, tells you that he saw it in his possession on the 29th of September, within six days of the murder.   These wit-

[Grant v. Commonwealth.]

nesses speak positively, say they know the weapon and that they are not mistaken in regard to it; telling you how they fix the time, one of them by the opening of the Normal School, and the other by the Agricultural Fair. If these witnesses are believed, his explanation with regard to the pistol, was untrue. If this is so, as we have before suggested, it adds materially to the presumption of guilt arising from his ownership of the pistol.

"But now a witness is called, Rebecca J. Price, who testifies that she saw the pistol in his possession on the very night of the murder, within less than an hour of the time when it was committed. If this is true you cannot fail to see and feel its importance. It advances the Commonwealth's case another, and a long stride. If Mrs. Spence was killed with this weapon, and if it is shown, not only that it is his, but that it was in his hands so immediately before the killing occurred, can he, without some explanation of how he parted with it between that time and the murder, escape the inference that he used it on this occasion? We repeat, if the pistol was then in his hands, and carried out with him, as Mrs. Price declares, and Mrs. Spence was murdered with it so directly thereafter, can he without explanation, escape the conclusion that he committed the murder? You will judge.

"But was it in his hands at the time referred to? One witness only testifies to having seen him with it. Several saw him at the bureau doing something—they know not what. None of them saw, as they declare, his left hand, or what was in it, at the time. Two of them went out on an errand, and he left before they returned. It was after they had gone out, Mrs. Price says, that he turned toward her with the pistol in his left hand. Her son was there, but he says he was engaged in reading, and did not observe the prisoner turn around.

"Mrs. Price testifies positively—says she saw the pistol distinctly, that she made an exclamation in consequence of it, and he dropped his hand,—that he turned his face again from her, appeared to place the pistol in his pocket, drew his coat around him, and went out. Can this witness be relied upon? Her veracity has been attacked, and witnesses called to testify that her character for truthfulness is not good. On the other hand a number of persons were called, who testify that they never heard her character for veracity questioned. Some of these persons further say that several of the witnesses who testified against her are themselves of bad character for truth, and unworthy of belief. You will judge whether she has been successfully impeached. If she has not, and you discover no motive in her to falsify, you will be warranted in believing her. If you find she has been successfully impeached, then you should not believe her, unless you find her to be corroborated by other testimony.' As we have seen, three other witnesses testify that the prisoner was at the bureau, engaged as

[Grant *v.* Commonwealth.]

she describes; that they did not see his left hand; that two of them were out on an errand, and that the third was engaged in reading, and says he did not observe the prisoner when he turned around.

"But on the cover of the bureau, where the prisoner had been engaged, several witnesses testify that a black mark was left, and that none was there when he went to it. And this mark, they say, was made by gunpowder. They tell you their reasons for saying so—some that they saw the grains, and knew them to be powder; and one, Mr. Miles, that he tasted it, and thus also ascertained it to be powder. If this was powder, left by the prisoner on the bureau cover, you will judge whether it does not corroborate the statement of Mrs. Price, wherein she says he had the pistol there at the time she describes. You will thus determine whether Mrs. Price is to be believed, and whether the prisoner had the pistol in his hands at the time referred to—just before the murder was committed.

"Next, a witness appears who tells us that Mrs. Spence had been spending the evening with her. That she, the witness, accompanied her out of the alley to the street; that it was soon after eight o'clock; that Mrs. Spence started on and directly came back; and that from what she said the witness particularly observed a man, who had been standing at Mr. Shaw's stable-shed, that he passed on when Mrs. Spence came back; that as he approached the light of the corner lamp, she could see that he had on a blue jacket, or blouse of bluish color; that she saw the prisoner the next day, and that he, and his jacket, resembled the man and the jacket she had seen the night before; and that the man she saw the night before was going north, towards the Eagle tavern. This description of clothing, and attempt at identification, we do not esteem important.

"Next, a witness tells us that he is employed at Taylor's livery stable, on the west side of the street, running north, between Shaw's place and the Eagle hotel; that soon after eight o'clock the prisoner passed him at the stable, going north; that they addressed each other, and that he, the witness, saw the prisoner turn at the Eagle, and pass up Gay street, westward, by Spence's and on in the direction of the Green Tree.

"Then Eliza Davis testifies that the prisoner passed her further west and south, soon after eight o'clock, talking to himself, with his hat swinging in his hand; and that she heard him say: 'The damn black bitch, I'll match her before to-morrow morning's sun.'

"The time fixed by these witnesses, you will observe, was shortly before the crime was committed.

"That they should be inaccurate as to the exact time, is very probable; it is a guess, made by such data as they had. It was after dark and before the murder, or before the witnesses had heard of it; beyond this most of them cannot be certain. These wit-

[Grant *v.* Commonwealth.]

nesses, if believed, show the movements and expressions of the prisoner just before the crime was committed. You will judge to what extent they harmonize with the other facts, before remarked upon, and whether they tend to connect the prisoner with the crime.

" Next, evidence is produced to satisfy you that the prisoner for a long time has entertained vindictive and malicious feelings towards the deceased. You will determine how far this has been successful. He is married to her niece. She advised his wife, as is said, to separate from him. Mrs. Davis says she heard him declare some two years ago that he would kill her for it, repeating the expression, and declaring that he was regardless of the consequences. Isaac Davis says he came in when the prisoner was talking at the time, and heard him use threats, but did not know to whom he alluded. One witness was called to impeach the veracity of Mrs. Davis, and two called to sustain it. You will say whether she is reliable. It appears that since the time of which Mrs. Davis and her husband speak, the prisoner has repeatedly visited the saloon of the deceased, and been waited upon by her, but that he did not visit her dwelling, and that they were not social. You will say what weight this evidence should receive, and whether it shows vindictive feeling, or motive for the crime.

" That some motive for the crime, or disposition to commit it, should appear is important. It must be borne in mind, however, that where murder is committed, the motive which induces it, frequently, if not generally, appears, to a properly constituted mind, greatly inadequate. The murderer, who commits the crime in cold blood, is cruel, ferocious, without ordinary conscience, belongs to the lowest class of human creatures, and is moved to the commission of his crime by considerations and causes that would offer no temptation, and present no motive, to ordinary men.

" The counsel on both sides have appealed to the defendant's appearance and conduct on the night of the murder, after its commission. The Commonwealth, as tending to show guilt, and the prisoner, as evidence of innocence. We will leave this with the comments which the counsel have made upon it, simply observing that we do not esteem it of so much importance as either side would seem to attach to it. Men are so differently constituted in mind and heart, that while one, after the commission of crime, will fly, another will stand his ground ; that while one will be overcome with alarm and remorse, and shun the presence of his victim, another will wear a brazen front, exhibit no concern, and mingle with those whom his conduct has excited and collected.

" Thus we have called your attention to the train of circumstances on which the Commonwealth relies, so far as they have seemed to us to be important.

[Grant *v.* Commonwealth.]

" First—to recapitulate—that the murder was committed by a firearm.

" Second—by the firearm found in the yard and produced here.

" Third—that this firearm belonged to the prisoner; and further that it was seen in his hands, if the Commonwealth's evidence can be relied upon, within less than an hour of the commission of the crime, without any attempt at explanation upon his part of how he parted with it between that time and the murder.

" Fourth—that he lied, if the Commonwealth's witnesses are believed, in attempting to create the belief that he had lost his pistol some three weeks before the murder.

" Fifth—that the prisoner's feelings towards Mrs. Spence, as the Commonwealth asserts, were vindictive and malicious, and that he had threatened her life.

" Such is the case upon which the Commonwealth asks for a conviction.

" The prisoner's counsel, as you have observed, urge that this case is insufficiently made out; and too uncertain to justify a finding of guilty. And they further rely upon an alibi; claiming that the evidence shows the prisoner to have been down about Rebecca Price's, and in that vicinity, at the time the murder was committed; and that he, therefore, could not have committed it.

" Does the evidence show this?

" It would seem to be reasonably clear that he was at Mrs. Price's, or in that vicinity, at about fifteen minutes before nine o'clock. A number of witnesses speak of his coming there as the train arrived; and the officers upon the train testify that it arrived at fifteen minutes to nine. From this time, it is also clear, that the prisoner did not go to Spence's until after the murder. But does it appear that the murder did not take place earlier than fifteen minutes to nine? Does it appear with certainty at what precise moment it did occur? If not, this point, raised for the prisoner, fails. Hoopes Matlack, it is true, says he had his watch in his hand, when he heard the shot, and that it marked ten minutes to nine o'clock.

" Is this reliable—the honesty of the witness is beyond all question—was the watch correct? This was five minutes after the train had arrived; and yet Mr. Snare says that he walked immediately from the train to Gay street, some two or three squares, and there saw the crowd at Spence's, and learned that the murder had been committed. Was or was not this more than ten minutes before nine, the time named by Mr. Matlack? Would it require five minutes to walk the two or three squares? But the crowd was then collected; the deceased had been carried into the house and the doctor was standing by, holding her arm, as the witness thinks. How long before this had the crime been committed? Dr. Massey says he walked from below the Eagle hotel after he

heard the shot, found her on the ground, examined her slightly outside, and had her carried in, as soon as he could find persons to do it.    How long did this consume ?    She was inside, and the doctor was there, apparently examining her again when Mr. Snare arrived, directly from the train.

"Now, is it or is it not reasonable to believe that she was shot before the train arrived ?    Dr. Massey further says he left his patient at half-past eight o'clock by his watch; had walked half a square when he heard the shot, and he, therefore, testifies that the shot was fired a little after half-past eight.    This would be before the arrival of the train.    Can you then find that the crime was not committed until the train arrived—fifteen minutes before nine—when the prisoner was seen down about Price's.    If not, this point made for the prisoner fails.

"If you find that the crime was committed so late as the defendant's counsel alleges, when the prisoner was down about Price's, then you will, of course, find that he did not commit it.

"If you find the defendant guilty, you must determine the grade of his crime.

"In Pennsylvania the legislature, considering the difference in guilt, where a deliberate intention to kill exists, and where no such deliberate intent appears, has distinguished murder into two degrees—murder of the first, and murder of the second degree—and required the jury trying the accused, if it finds him guilty, to ascertain and find by their verdict whether it be murder of the first, or murder of the second degree.

"And further provided that 'all murder which shall be perpetrated by means of poison, or lying in wait,    *    *    or by any other kind of wilful, deliberate and premeditated killing, shall be deemed murder in the first degree ; and all other kinds of murder shall be deemed murder of the second degree.'

"Then, if the defendant is guilty, is it of murder of the first, or murder of the second, degree ?

"We have seen that where the crime is committed by lying in wait, it is murder of the first degree.

"Did the individual who murdered Mrs. Spence 'lie in wait' for her ?    What is the plain inference ?

"If he did, the offence is murder in the first degree.    But, as we have seen, all other wilful, deliberate and premeditated killing is also murder in the first degree.    So that if the individual who committed this crime did not watch and wait for Mrs. Spence, is it not plain that the killing was wilful, deliberate and premeditated ? The manner in which she was killed—after night, clandestinely, the deadly character of the weapon used—would seem to leave no room for doubt of this.    In our judgment the crime committed was murder of the first degree.

"Still, we repeat, this question is for you alone to determine.

[Grant *v.* Commonwealth.]

And if you convict the prisoner you must say whether it is of murder in the first or murder of the second degree.

"In conclusion, we urge upon you, in passing upon the case, to bear in mind its importance. To the prisoner it involves everything of earthly desire—life itself. You will, therefore, give to the facts not only their most reasonable construction, but also their most charitable and merciful construction. And if, when thus considered, they fail to satisfy you of his guilt, you will acquit him, regardless of all consequences. And he is entitled to the benefit of every reasonable doubt." [The court here explained the meaning of the term "reasonable doubt."]

"If, on the other hand, the facts satisfy your minds of his guilt, you must convict him. In such case no consideration of pity or mercy can influence you. To listen to such suggestions would be more than a mistake—it would be a crime against society. With the consequences which may attend conviction, you have nothing to do—they rest upon others. Following the pathway of the evidence, you can turn neither to the right nor the left, but must accept the conclusion to which the facts lead—as well by your duty to the public, as by the solemn oaths and affirmations pronounced by you on entering the jury-box. If you entertain views unfavorable to capital punishment, you must disregard them here—remembering that it is not the jury, but the law that inflicts the punishment. The jury does not pronounce the sentence which condemns to death, but simply determines whether the prisoner has committed the crime.

"You will now take the case, and forgetting everything but the law, the evidence, and your duty, you will pass judgment between the Commonwealth and the prisoner."

The jury, on the 4th of November 1871, returned a verdict against the defendant of "Guilty of murder in the first degree."

A rule to show cause why a new trial should not be granted, was discharged January 31st 1872, and the prisoner sentenced to be hanged.

He removed the record to the Supreme Court and assigned the following errors :—

1. The Court erred in saying to the jury, "does it appear with certainty at what precise moment it (the murder) did occur? if not, the alibi relied upon by the prisoner fails."

2. The Commonwealth failed to show any motive for the commission of the crime.

3. The Court erred in allowing declarations of the prisoner made two years ago, to be given in evidence to show a motive.

4. The President Judge left the bench while the court was in session, and during the progress of the trial.

5. The evidence fails to prove the guilt of the prisoner, and he should have been acquitted.

[Grant v. Commonwealth.]

*N. Strickland, Jr.,* and *W. B. Waddell,* for plaintiff in error.

*G. F. Smith,* District Attorney, for the Commonwealth.

The opinion of the court was delivered, July 3d 1872, by

THOMPSON, C. J.—The plaintiff in error in this case was indicted and convicted in the court below, of the crime of murder in killing one Amanda R. Spence, by shooting her, and his case has been brought up for review under the provisions of the Act of Assembly of the 15th February 1870. The act allows a writ of error as of right " in all cases of murder and voluntary manslaughter," and defines our duty to be " to review both the law and the evidence, and to determine whether the ingredients necessary to constitute murder in the first degree shall have been proved to exist; and if not so proved, then to reverse the judgment, and send the same back for a new trial, or to enter such judgment as the laws of this Commonwealth require."

We have listened to the able and zealous argument of the prisoner's counsel as if on a motion for a new trial; we could find no fault with that, for it in fact was a method of showing that the ingredients of murder in the first degree had not been proved. But our duty under the Act is widely different. A court on hearing a motion for a new trial, judges of the action of the jury on the testimony on both sides, and considers whether too much or too little weight has been given to features for the whole of the testimony in view of its intrinsic character; the manner in which it has been given by the witnesses, their apparent bias, intelligence or want of it, and character. All this has been before and under the eye of the court, and they can say on a calm reconsideration of it all, whether justice does, or does not, require a new trial. This court cannot do this, and the Act of Assembly does not contemplate any such thing. Our duty is to see whether there was evidence given in the case, which, if believed by the jury, would furnish the elements, or " ingredients," as the act says, of murder in the first degree, under our statutes on the subject, viz.: the *corpus delicti,* either " killing by poison, lying in wait, or by any other kind of wilful, deliberate and premeditated killing, or which shall be committed in the perpetration or attempted perpetration of any arson, rape, robbery or burglary." To this extent is the duty devolved on this court of reviewing the facts in cases of convictions for murder in the first degree, by the Act of 1870. It goes no further towards enabling it to grant new trials. If there have appeared in the testimony the ingredients to constitute murder in the first degree, our power ceases. Whether the jury should or should not have believed and relied on it, is what this court cannot examine into. That must be inquired of on a motion for a new trial in the court below, as formerly.

[Grant *v.* .Commonwealth.]

We have examined the testimony given in this case as returned by the learned judge below, and in our opinion it discloses every ingredient necessary under the law, to constitute murder in the first degree, and to connect the prisoner with the performance of the wicked deed. That the jury believed the evidence is conclusively shown by their verdict. We do not mean to recapitulate it minutely. The *corpus delicti* was clearly shown, and not controverted by the prisoner. The life of the deceased was taken by shooting her at or near her own kitchen-door, in the night time, and the instrument of death was a peculiar sort of firearm or pistol, constructed out of an army rifle, and was found lying near the body. The ownership of the pistol was traced to the prisoner, and testimony was given to show that he picked or scraped, and capped the nipple, that evening shortly before the murder; that there was an old grudge in the mind of the prisoner towards the deceased; that he was heard to express threats that evening that he was going to commit violence on some one while walking rapidly towards the house of the murdered woman, and shortly afterwards the sound of a firearm was heard in that direction by the neighbors. There was testimony to raise an inference that he was in the lot at the back of the kitchen, for dock burrs, such as grew there were proved to have been picked from his clothes a very short time after the killing of Mrs. Spence took place. There was also proof that marks on the weeds and grass by the fence near the kitchen-door, indicated that some one had lain there that night, at least for a time, for some purpose or other. There was proof also, that the prisoner alleged after arrest, or about that time, that he had not the pistol in his possession on that evening, that he had lost it some weeks before. It was a peculiar weapon, and the witness who swore she saw it on his person on the evening when he was doing something with it at her bureau, said she knew it well, and had seen it often before. It was exhibited without denial or objection on the argument before us, and I can safely say, that any person who had once seen it would have no difficulty in recognising it on seeing it again. The testimony of this witness was distinct that the prisoner had it the evening of the murder and before she heard the shot. It was further proved that the wad discharged from the pistol and picked up where Mrs. Spence fell, was identical with a piece of calico found on the bureau in the prisoner's house, in the top drawer of which were balls and caps suitable for loading the pistol in question. This was evidence, although there may have been hundreds of yards of the same material for sale in the town. The firearm and the ammunition in so close proximity to it, gave consequence to the kind of wadding shown in his possession. But our duty is done when we find in the testimony proof of the ingredients of murder in the first degree; this we unhesitatingly do. Whether it was right or wrong for the jury to believe it,

[Grant v. Commonwealth.]

and disbelieve the prisoner's theory of his actions on the occasion, was for the jury, and it was all presented to them in a clear, impartial, and intelligible manner by the learned judge, and their finding afterwards approved by him on a motion for a new trial.

The assignment of error to the portion of the charge quoted, discloses no error whatever, and needs no argument to vindicate the remark made.

But we are of opinion that when error is alleged to any portion of the charge of the court, or ruling on points of evidence or points of law in a case like this, it cannot be brought to the notice of this court otherwise than by bill of exception, as in civil cases: See §§ 57, 58, Act of 31st March 1860; Hopkins v. The Commonwealth, 14 Wright 9. The Act of 1870 does not alter or supply the law in this respect, and this court has no other means of knowing that objection was made in time, or at all, but by this means. In *favorem vitæ* we may look at errors ineffectively assigned, but as we said in the case just referred to, we cannot reverse unless the exception be taken on the trial. So far as to ascertain whether the facts bring a conviction within the act defining murder in the first degree, the act dispenses with the bill of exceptions, but it does not dispense with it in questions raised on the trial. We expressed ourselves in regard to the loose and insufficient character of the Act of 1870 in the case of Schoeppe v. The Commonwealth, 15 P. F. Smith 51 ; but our remarks do not seem to have attracted the attention of the General Assembly, as they should have done, and we must administer the act as best we may, to make it consist with the certainty of procedure in other cases brought for review to this court.

There is nothing further for us to say in this case, than that the sentence of the court below upon the prisoner is affirmed.