## Commonwealth v. Danz, Appellant.

*Criminal law—Murder—Appeals—Duty of the appellate court—Evidence —Act of February 15, 1870, P. L. 15.*

Under the Act of February 15, 1870, P. L. 15, it is the duty of the Supreme Court on an appeal from a conviction of murder of the first degree to review both the law and the evidence, and to determine whether the ingredients necessary to constitute murder of the first degree were proved to exist. Whether such ingredients were proved to exist is to be determined by a review of the evidence produced by the commonwealth, for if they are there found, the appellate court cannot disturb the verdict because it may be plausibly argued that the jury should not have believed the witnesses for the commonwealth, or that, in view of the contrary evidence, the prisoner should have been acquitted.

That a verdict might fairly have been a different one is no ground for judicial interference with the one rendered, if there was proper evidence to support it; and this is true whether such evidence be circumstantial or positive. Facts to be found from contradictory evidence are always for the jury and never for the court. It is only when, from undisputed evidence, but one finding can follow and a jury reaches a different one, that a court must interfere and avert injustice by setting the verdict aside.

The evidence in this case considered by the Supreme Court and found to be sufficient to support a verdict of guilty of murder of the first degree by poison.

DEAN and MESTREZAT, JJ., dissent.

*Criminal law—Murder—Poisoning—Arsenic.*

Where it is established that arsenic is rapidly eliminated from the human body after administration, it is not incumbent on the commonwealth to prove that a quantity of poison sufficient to cause death was found in the body before a jury can be allowed to find that it was the cause of death, if the evidence sufficiently establishes the fact that the poison alleged to have caused death did kill the deceased.

Where it appears not only that arsenic is quickly eliminated from the body before death, but also that it escapes in form of arsenious gas after the body lies in the grave, the quantity of arsenic remaining nearly two years after death is not evidence of the quantity in the body at the time of death, and the quantity that may be found in it then is not evidence of the quantity that had been administered.

*Criminal law—Murder—Poisoning—Arsenic—Antimony—Evidence.*

On the trial of a woman indicted for poisoning her husband with arsenic, there was evidence that the prisoner had also administered antimony to the husband for the alleged purpose of curing him of drinking. The commonwealth introduced evidence to the effect that the deceased had not been a drunkard. There was testimony that death had been probably accelerated by the administration of antimony. The court gave such instructions as excluded from the consideration of the jury any other cause of death than arsenical poisoning. *Held,* that the fact of the administration

of antimony was, under all the circumstances, a matter for the consideration of the jury.

*Criminal law—Murder—Arsenical poisoning—Motive—Evidence.*

On the trial of an indictment for murder by arsenical poisoning where all the ingredients of murder of the first degree are shown by the evidence, the jury may return a verdict of guilty of murder of the first degree, although the motive of the prisoner is not shown. The fact of murder being established, the inability to discover the motive does not disprove the crime.

*Criminal law—Murder—Appeals—Review—Evidence.*

On an appeal in a murder case where numerous errors are assigned to rulings on evidence, the Supreme Court will examine each of the rulings with the utmost care, and if they find that each was plainly right, they will say so generally without demonstrating that there was no violation of the rules of evidence.

*Criminal law—Murder—Evidence.*

A verdict of guilty in a murder case will not be reversed on appeal because the court erroneously disallowed an offer of evidence by the prisoner where it appears that immediately afterwards and without any renewed objection by the commonwealth, the evidence covered by the offer was actually given.

*Trial—Points of charge—Answers to points.*

A trial court cannot be convicted of error in refusing to affirm a point where an affirmance would have given the jury a license to find material facts of which there was no evidence.

*Criminal law—Murder—Trial—Points.*

On the trial of an indictment for murder the trial court is not required, in answer to a point, to repeat instructions which it has previously, clearly and correctly given in an answer, or answers, to other points. In such a case no harm is done to the defendant if the point is not read to the jury.

*Criminal law—Murder—Evidence—Misconduct of district attorney.*

On the trial of an indictment for murder by poison the prisoner cannot complain of the conduct of the district attorney in not calling as a witness a physician who had examined the body of the deceased, where it appears that early in the trial counsel for the defendant had been informed that the physician would not be called by the commonwealth, and that the defendant could call him if she so desired.

Argued Oct. 27, 1904. Reargued Feb. 13, 1905. Appeal, No. 218, January T., 1904, by defendant, from judgment of O. & T. Phila. Co., April T., 1903, No. 154, on verdict of guilty of murder of the first degree in case of Commonwealth v. Catharine Danz. Before MITCHELL, C. J., DEAN, FELL, BROWN, MESTREZAT, POTTER and ELKIN, JJ., on reargument. Affirmed.

Indictment for murder. Before MARTIN, P. J.

The facts appear by the opinion of the Supreme Court.

When Robert McKenty was on the stand he was asked this question:

" Q. She made the remark you have testified to and then went on toward the cell? A. We went on to the cell. Q. Where did you go from that point? A. To the cell room, and I brought Hossey out of the cell and at that time Mr. Donaghy was in the cell room, we were probably about as far from here to that railing from one another. Q. Hossey and the woman? A. Yes, sir; she throwing up her hands and saying, ' I don't know that colored man, I never saw that nigger.' I said, ' George is that the butcher's wife on Fourth street that paid you the $51.00 for that powder?' and he said, ' Yes.' ''

Judge Martin: " Q. Who is George? A. Hossey."

Mr. Bell: " Q. Did she hear you say that? A. The probabilities is she did not; I cannot say whether she did or did not, I said it loud enough. That is not the one that Donaghy said he did n't hear."

Mr. Scott objects and moves to strike the witness' answer out.

Judge Martin: The jury can pass on whether she heard it or not.

Exception for defendant. [13]

Frederick Genth, a witness for the defendant, while under direct examination was asked these questions:

" Q. And these are the two bottles which have been produced here in court and identified by Mr. Shrawder? A. Yes, sir. Q. What did you do with them? A. I examined them for arsenic. Q. What did you find? A. I found arsenic."

Mr. Bell: Confine it to the fluid used here.

Mr. Scott: But Eckels testified it was not in either kind.

The Court: My recollection of Mr. Myers's testimony is that he used the Royal Embalming fluid.

Mr. Scott: I will read from Mr. Eckels' testimony, page 35: " Q. Does that embalming fluid, Primero, you are selling to-day, contain arsenic in sufficient quantities to be weighed? A. No, sir. Q. It would be impossible? A. Yes."

Mr. Scott: I propose to contradict him upon that and show that we have examined this very Primero embalming fluid and that it does contain arsenic in weighable quantities.

Objected to.

Objection sustained, as the portion of testimony read from was cross-examination. Exception for defendant. [17]

Verdict of guilty for murder of the first degree upon which judgment of sentence was passed.

*Errors assigned* were (1–21) various rulings on evidence; (22–51) refusal to answer thirty points offered by defendant.

*Henry J. Scott*, for appellant.—Circumstantial evidence is only competent to support a verdict of guilty when it excludes every other reasonable hypothesis than that of guilt: Reg. v. Hodge, 2 Lewin C. C. 27.

Since an action without motive would be an effect without cause, a presumption is consequently created in favor of innocence by the absence of all apparent inducement for the commission of the alleged offense : Will's Circumstantial Evidence, 49 ; State v. Moxley, 102 Mo. 374 (14 S. W. Repr. 969) ; People v. Ah Chung, 54 Calif. 398 ; United States v. Reder, 69 Fed. Repr. 965 ; People v. Foley, 64 Mich. 148 (31 N. W. Repr. 94) ; Gray v. Com., 101 Pa. 380.

The accused's opportunities to commit the crime, her conduct and alleged falsehoods prior, during or subsequent to the alleged crime, are not competent to prove the corpus delicti : Com. v. Johnson, 162 Pa. 63 ; Reg. v. Frost, Gurney Rep. 689.

That defendant administered tartar emetic to her husband was irrelevant and incompetent evidence.

The rule which prohibits the proof of extraneous crimes to prove the crime charged is applied by the courts of this state : Shaffner v. Com., 72 Pa. 60 ; Com. v. Birriolo, 197 Pa. 371.

The commonwealth should have satisfactorily accounted for not calling Dr. McFarland : Com. v. Rhoads, 23 Pa. Superior Ct. 512 ; Com. v. Bubnis, 197 Pa. 542.

*John C. Bell*, district attorney, with him *Owen J. Roberts*, assistant district attorney, for appellee.—The corpus delicti was proved : Zell v. Com., 94 Pa. 258 ; Gray v. Com., 101 Pa. 380 ; People v. Hickman, 113 Cal. 80 (45 Pac. Repr. 175); State v. Heidenreich, 29 Oregon, 381 (45 Pac. Repr. 755) ; Fletcher v. State, 90 Ga. 468 (17 S. E. Repr. 100).

The function of determining what are the facts in the case and what inferences are to be drawn from them is for the jury, and unless the finding of the jury is entirely contrary to what the commonwealth's evidence shows to be the probable truth, there should not be any intervention or interference with the verdict: Grant v. Com., 71 Pa. 495; McCue v. Com., 78 Pa. 185; Gray v. Com., 101 Pa. 380; Com. v. Morrison, 193 Pa. 613.

The commonwealth does not admit that it was under any necessity to prove a motive in this case. If it proved a case containing every ingredient of the crime of murder, and satisfied the jury upon every one of the ingredients of the crime of murder, the mere fact that no motive could be definitely assigned for the action of the defendant would constitute no legal reason for acquitting her: McLain v. Com., 99 Pa. 86; Lanahan v. Com., 84 Pa. 80; McCue v. Com., 78 Pa. 185; Zell v. Com., 94 Pa. 258.

It is both legally and medically established beyond peradventure that in order to sustain a conviction it is unnecessary to prove that any given quantity of arsenic was found in the cadaver after death: Tawell's Case, 1 Woodall's Celebrated Trials, 162; Com. v. Zell, 94 Pa. 258.

There was no duty upon the commonwealth to call Dr. McFarland unless it saw fit to do so: Onofri v. Com., 20 W. N. C. 264; McCabe v. Com., 8 Atl. Repr. 45.

In a number of jurisdictions it has been held that upon a trial for murder, previous assaults, whether with the same or a different instrument, and previous attempts to take life, are admissible, as showing intent and motive: State v. Nugent, 71 Mo. 136; Medina v. State, 49 S. W. Repr. 380; Pritchett v. State, 92 Ga. 65 (18 S. E. Repr. 536); State v. Patza, 3 La. Ann. 512; State v. Merkley, 74 Ia. 695 (39 N. W. Repr. 111); Hamilton v. State, 56 S. W. Repr. (Texas), 926; State v. Walters, 45 Ia. 389; State v. Rohfrischt, 12 La. Ann. 382; Com. v. McCarthy, 119 Mass. 354; Com. v. Bradford, 126 Mass. 42.

It has always been the rule of this court in criminal, as well as civil matters, that where the court has covered the point in its general charge, or considered and answered the point in connection with another point, it is not error to fail or refuse

to answer such point: McLain v. Com., 99 Pa. 86; Com. v. McManus, 143 Pa. 64; Com. v. Clark, 3 Pa. Superior Ct. 141.

OPINION BY MR. JUSTICE BROWN, April 17, 1905:

By the Act of February 15, 1870, P. L. 15, it is made our duty to review both the law and the evidence in this case, and to determine whether the ingredients necessary to constitute murder of the first degree were proved to exist. The first assignment of error is based on their alleged absence. Whether they were proved to exist is to be determined by a review of the evidence produced by the commonwealth to sustain its grave accusation, for if they are there found, we cannot disturb the verdict, because it may be plausibly argued that the jury should not have believed the witnesses for the commonwealth, or that, in view of the evidence offered by the prisoner, she should have been acquitted. That a verdict might fairly have been a different one is no ground for judicial interference with the one rendered, if there was proper evidence to support it; and this is true whether such evidence be circumstantial or positive. Facts to be found from contradictory evidence are always for the jury, and never for the court. It is only when, from undisputed evidence, but one finding can follow and a jury reaches a different one, that a court must interfere and avert injustice by setting the verdict aside.

William G. Danz died June 27, 1901. On March 12, 1903, his body was exhumed and the coroner's physician made a post-mortem examination. He testified to the condition of the organs at the time the body was exhumed and delivered the heart, liver, kidney, stomach, intestines, brains and part of the muscular tissue of the thigh to an expert chemist for examination. That expert testified that he had found arsenic and antimony in various organs of the body in weighable and appreciable quantities. The body had been embalmed, and, to repel any presumption that the arsenic found might have been injected into it by the embalmer, the chemist who manufactured the embalming fluid was called and testified that it contained no more than a mere trace of arsenic, which was neither weighable nor appreciable. The two physicians who had attended Danz during the last four weeks of his life testified to his symptoms. Three most eminent members of the

medical profession, called as experts, pronounced them to be those of arsenical poison, and testified that, from the evidence produced by the commonwealth, they were of opinion such poison had caused the death, probably accelerated by the use of antimony. The wife of the deceased had administered the antimony to him for the alleged purpose of curing him of the drinking habit. When the prisoner was asked to allow the body to be exhumed, she said, in consenting, that it would be found full of poison, because Dr. Eberhard, one of her husband's physicians, had told her so. When she made this statement nothing had been said by any one about poison, and it does not appear that the doctor had ever told her what she said. Hossey is a colored man from whom, according to the commonwealth's theory, the poison was obtained. Her conduct, when she confronted him at the city hall, was a most important and significant circumstance. She became suddenly and greatly excited and asked to be taken away from him, saying and repeating: "I do not know that colored man, I never seen that nigger, I never seen him; take me away from here." To this he replied: "What is the matter with you, woman; I am not giving you away." He was asked in her presence whether she was the butcher's wife who had paid him $51.00 for a powder; to which he replied, "yes." Shortly afterwards she mentioned the colored man's name, though it had not been mentioned by any one before. Subsequently she admitted she knew him, and agreed with him in certain of his statements. She admitted that she had got a powder from him, that it was gray in color, something like slate pencil dust. Finally, when taken to another room, she admitted that after her husband's death she had paid Hossey the $51.00 referred to by him and at the time stated by him. When he was arrested there were found in his office a box of rough on rats and a package wrapped up in a newspaper, tied with a string, and similar to the one the prisoner said she had got from him. It contained gray powder. A chemical analysis of the contents of this package, of one similar to it sold by Hossey to a man named Gavin and of the rough on rats found in his possession at the same time disclosed a large proportion of arsenic in each. A number of witnesses were called who had known Danz from five to twenty years, and, according to their testi-

mony, he was not a man who drank to excess. There were frequent quarrels between him and his wife. He accused her of trying to poison him. She stated to some of the witnesses that she would be happier if he were dead. To one she repeatedly said she would like to get rid of him. To others she said he would not survive the month in which he died. To Mrs. Heinel she stated that she had put the powders Hossey had given her into her husband's coffee, and that the son-of-a-bitch had discovered it and thrown it out, but she would catch him yet. To still another she said she was sorry he had not died a few weeks before, as she would have saved a premium on his life insurance. The foregoing are the main features of the commonwealth's case. That they were sufficient to establish the corpus delicti needs no demonstration from us, and, as we find in the evidence the ingredients necessary to constitute murder of the first degree, the first assignment must be overruled.

There was evidence offered for the prisoner from which her learned counsel asked for an acquittal. Distinguished experts testified that her husband had not died from arsenical poison, and, if their opinions were correct, the commonwealth's case fell without more. Other features of the defense might be referred to upon which confident reliance may have been placed that there would be a different finding, but it is not for us to discuss them or to say what the verdict should have been. It was for the jury alone, as they were properly told by the learned trial judge, to determine from all the evidence what were the real facts in the case. They have discharged that exclusive duty, and their verdict cannot be disturbed, unless in its instructions to them or in its rulings on the trial the court fell into error. We have referred to the case as made out by the commonwealth that it may appear what ingredients necessary to constitute murder of the first degree were proved to exist. " Our duty is to see whether there was evidence given in the case, which, if believed by the jury would furnish the elements, or 'ingredients,' as the act says, of murder in the first degree, under our statutes on the subject, viz.: the corpus delicti, either 'killing by poison, lying in wait, or by any other kind of willful, deliberate and premeditated killing, or which shall be committed in the perpetration or attempted perpetra-

tion of any arson, rape, robbery or burglary.' To this extent is the duty devolved on this court of reviewing the facts in cases of conviction for murder in the first degree, by the act of 1870. It goes no further towards enabling it to grant new trials. If there have appeared in the testimony the ingredients to constitute murder in the first degree, our power ceases. Whether the jury should or should not have believed and relied on it, is what this court cannot examine into. That must be inquired of on a motion for a new trial in the court below, as formerly : " Grant v. Commonwealth, 71 Pa. 495.

But a small quantity of arsenic was found. The commonwealth made no attempt to show just what amount had been administered. Dr. Shoemaker, one of the experts called by it, testified : " Arsenic is eliminated by all the glands of the body inside and all the glands of the body outside ; it is eliminated through the hair and is even deposited in the hair; eliminated through or by the kidneys and through the bladder and urine, the bowels, and even, owing to the rapid elimination of arsenic, especially if the patient vomits, there will be very little arsenic in the body after death or in the subject." In this he was supported by medical authorities. " Arsenic is not a strongly cumulative poison ; it is temporarily deposited in the liver and other organs of the body, after absorption, but it is rapidly eliminated from the system by the urine, bile, and other secretions. Should the person survive for two or three weeks no trace of poison may be found after death, in consequence of its total elimination during the interim : " Reese's Medical Jurisprudence and Toxicology, 443. And it is not incumbent on the commonwealth to prove that a quantity of poison sufficient to cause death was found in the body before a jury can be allowed to find that it was the cause of death, if the evidence sufficiently establishes the fact that the poison alleged to have caused death did kill the deceased. In Tawell's Case, 1 Woodall's Celebrated Trials, 162, it was urged by the counsel for the prisoner that it was a rule of law that there ought to be proof of the finding of such a quantity of poison in the body of the deceased as would necessarily occasion death; but Mr. Baron Parke instructed the jury that it was not necessary to prove that such a quantity as to destroy life had been found in the stomach, if the evidence satisfied them that death had been oc-

casioned by poison and that it had been knowingly administered by the prisoner. This is the law. If it were different, murderers by arsenic would often escape. The body of Danz was exhumed nearly twenty-one months after his death. According to the testimony of the experts and the unquestioned medical authorities, if arsenic was administered to him, it was distributed through every organ and tissue, and during the twenty months that the body lay in the grave it would escape in the form of arsenious gas. The weighable quantity found in the body was taken from but portions of it. How much remained in the whole body does not appear, nor was it necessary to show; for, in view of the testimony and authority just quoted, what remained nearly two years after the death would not have been evidence of the quantity in the body at the time of death, and the quantity that might have been found in it then would not have been evidence of the quantity that had been administered.

There was evidence to show that the prisoner had administered antimony to her husband for the alleged purpose of curing him of drinking. This was admitted without objection by the prisoner. There was nothing to show that the antimony had caused death, and the jury must have understood from the evidence and the distinct instructions given them that they could not convict unless they were satisfied that the death had been caused by the administration of arsenic with felonious intent. The specific direction given by the learned trial judge, in his answer to the defendant's twenty-first point, was : " The commonwealth must show that not only was arsenic bought, but that the same was administered to William G. Danz with a felonious intent by Mrs. Danz, the defendant, and that he died as a result thereof, and unless this is proven beyond a reasonable doubt, the defendant must be acquitted." This in itself excluded from their consideration any other cause of death for which she could be held acccountable on the indictment against her. There was testimony that death had probably been accelerated by the administration of antimony, and the evidence of that administration was, therefore, relevant, for it tended to show the physical condition of the deceased and the greater susceptibility of his system to the fatal influence of arsenic. The symptoms of the deceased were described to the experts,

and it was proper that they should know what other drugs had been given him before they expressed opinions on which a life might depend. No possible harm was done the prisoner by this evidence, and, for the reason stated, it had a fit place as a particular in the proofs. Even if it had been objected to, it would have been properly received for another reason. The theory of the commonwealth, supported by testimony, was that Danz had not been a drunkard, and the antimony had not, therefore, been administered by his wife from the motive assigned by her. If this theory was correct—which was for the jury's determination—they could have properly taken into consideration the administration of the antimony on the question of the felonious intent of the prisoner when she gave her husband the poisonous powder obtained from Hossey.

It is urged as a reason for the reversal of this judgment that no motive was disclosed for the crime charged. The position taken by the appellant's counsel is found in the twentieth point submitted for her, which is: " There being no evidence of the administration of arsenic, the commonwealth's case being based upon circumstantial evidence alone, the prosecution must show a motive for the crime, and, unless this motive is clearly proven, the defendant must be acquitted." This was affirmed without qualification, and such affirmance of it was more than the appellant had a right to expect. Though the evidence against her was circumstantial, if it satisfied the jury of her guilt, she is not to be saved from the consequences of her crime because a motive for its commission, however important a matter the same might be, had not been disclosed. There can be no escape from punishment for crime when all the elements of it are proved, whether the evidence be positive or circumstantial, simply because the motive lies hidden in the heart of the only one who knows it. If the guilt of the prisoner was established beyond a reasonable doubt, some motive existed, known to a certainty only to herself, and disclosed only to the Unseen Eye from which the secrets of no heart can be hidden. Though it had been undisclosed to her triers, they could not, for that reason alone, have declared her guiltless. If, from all the circumstances in the case, they believed that it was her hand that gave the poison as her chosen agency to accomplish her husband's death, the jury must, under the instructions given

them, have found a motive clearly proven, or they would have acquitted her. What they found it to be we do not know. What they might have found it, can be readily conjectured from the evidence. It might have been hatred; it might have been weariness of her husband and a longing for a life that she thought would be pleasanter and happier without him, or it might have been avarice aroused by insurance policies on his life. Whatever it was, the jury found it, though they were not required to find one. " The motive may be obscure, indeed may not be fathomed; but the act was there plainly and fully obvious to the senses, and the effect of it clearly open to the prisoner's own mind. The ingredients of the crime of murder in the first degree were all there, however inscrutable may be the causes which moved the prisoner to commit the deed. When all the elements of the crime are present, and when there can be but one rational inference from the act itself, retribution cannot be avoided, because the motive lies hidden and unrevealed in the heart of him only, who could disclose it : " McCue v. Commonwealth, 78 Pa. 185. This was followed in Lanahan v. Commonwealth, 84 Pa. 80, where the same learned chief justice said : " It is asked what was the motive ? True, this is not yet solved, but the fact of a deliberate and intentional killing is there. The fact of murder being established, the inability to discover the motive does not disprove the crime. When the question is, whether the prisoner committed the crime, his motive may be a most important fact in the proof, but the crime being established it is well shown in McCue v. Commonwealth, 28 P. F. Smith, 185, that the hidden motive is unnecessary to be disclosed."

The assignments from two to twenty-one, inclusive, relate to alleged errors in rulings on offers of evidence and in overruling motions to strike out certain testimony. All have been examined with the utmost care, and no one of them, except the seventeenth, calls for any discussion of its merit, for the ruling upon each was plainly right. In such a case we do not feel called upon to say more by demonstrating that there was no violation of the rules of evidence, for such demonstration would be of use to no one, and, if of interest to any, only to counsel who raise the questions. Due consideration must be given them, as of every question raised before us; but when

clearly without merit, there is no duty on us to say more of them.

At first blush the seventeenth assignment seems to direct attention to substantial error and to call for a reversal of the judgment. At the very threshold of its case the commonwealth undertook to prove that poison had not been injected into the body by the embalmer. He testified that he had used Royal Fluid, which he had purchased from Eckels & Company. Howard S. Eckels, the manufacturing chemist who had sold this fluid to the embalmer, was called to prove that there was no weighable or appreciable arsenic in it. In his examination in chief he stated that he had manufactured and sold two kinds of fluid to the embalmer—Primero and Royal—and in speaking of his fluid generally, he said it contained no weighable or appreciable arsenic. On cross-examination he distinctly stated, without objection from the commonwealth, that the Primero Fluid did not contain weighable arsenic. The theory of the defense was that the fluid used by the embalmer had contained the arsenic found in the body. Genth, an expert called by the appellant, testified that he had examined both fluids and found arsenic in each. It was then proposed to prove by him that he had found arsenic in a weighable quantity in the Primero. This was objected to on the ground that the Royal, and not the Primero, had been used by the embalmer, and the court overruled the offer, stating as a reason for doing so that the portion of the testimony of Eckels which was to be contradicted was in his cross-examination. So it was, but it was germane to his examination in chief, was relevant and material, for he must have been understood as saying, in reply to the questions put to him by the commonwealth, that arsenic was not found in weighable and appreciable quantities in either of his fluids. If found in the Primero, the appellant had a clear right to prove that fact, for it affected the credibility of one of the most important witnesses for the commonwealth on a most material matter, and, from the seventeenth assignment, it seems that this right was denied and injustice done the prisoner, calling for a reversal. But, turning to the notes of testimony, there is found, immediately following the disallowed offer, the testimony of the witness, Genth, given without renewed objection by the commonwealth, that he had not only found arsenic in

the Primero, but had weighed it.   What had been improperly excluded was admitted a moment afterwards, with no testimony on any other feature of the case intervening.   It is as if the overruled offer had been instantly renewed and the answer given, without objection, upon which the appellant hoped to impair the credibility of Eckels.   For that purpose it was as useful to her as it possibly could have been if given in support of the overruled offer, and the seventeenth assignment must, therefore, be dismissed.

The remaining assignments call attention to alleged errors in refusing to affirm thirty of the forty-eight points submitted by the appellant.   Some of these assignments, standing alone, seem to call for affirmance of certain refused points, but when they are examined in connection with the proofs in the case, the general charge of the court and its answers to other points, not one of them was improperly refused.   We need give but two or three illustrations of this.

The refusal to affirm the twenty-seventh point is the thirty-sixth error assigned.   That point was: "If the jury believe that Professor Genth found arsenic in weighable quantities in the two ounces of fluid which he chemically analyzed, they are at liberty to conclude that the arsenic found in Danz's body came from this source, and if so, the defendant must be acquitted."   The jury could not have found from Genth's testimony that there was arsenic in weighable quantities in the Royal Fluid, which was the one used by the embalmer, for the witness distinctly testified that he had not weighed the arsenic found in it.   His testimony is: "Q. You examined the bottle of Royal Embalming Fluid, did you?   A. I did, and I found it to contain arsenic.   Q. In what quantities?   A. I did not weigh the arsenic in the Royal Embalming Fluid, but I did weigh it in the Primero."   Eckels testified that there was not a weighable quantity in the Royal—not more than a mere trace of arsenic.   If the twenty-seventh point had been affirmed, the jury would have been given a license to find a material fact of which there was no evidence.   Point thirty-two and one-half was: "If the jury believe that the arsenic found in Danz's body got there in any way after death, the defendant must be acquitted."   There was no evidence from the beginning to the end of the case, that the weighable arsenic found in the body

had got there after death. It is quite to the contrary; for it is, that if any arsenic did get into the body after death, there was a mere trace, that could not be weighed. That found was weighed, and if defendant's last point had been affirmed, the jury would have been allowed to imagine the existence of an unproved fact, so important that there might have been a verdict which would have wronged the commonwealth. The thirteenth point submitted was: " Unless the jury believe that William G. Danz came to his death through the administration of arsenic by Mrs Danz for the purpose of taking the life of William G. Danz, and unless they arrive at this conclusion without a reasonable doubt the defendant must be acquitted." This was not affirmed, but in the general charge the court said: "Even if Mrs. Danz administered to her husband poison, and by reason of that poison he died, if she administered it to him ignorantly, in good faith believing it was a cure for drunkenness, your verdict should be not guilty. Although Hossey may have furnished her with poison, and he knew its deadly character, and intended that she should use it to kill her husband, if she used it innocently she is not guilty of the crime of murder." And in affirming the eighth, seventeenth and twenty-first points, the jury were specifically instructed as follows : " The defendant, Catherine Danz, stands in the light of the law an innocent woman and the burden is upon the commonwealth to prove her guilty of the crime of murder. The commonwealth must do that beyond a reasonable doubt; the burden of proof is on the commonwealth to prove the defendant guilty and that burden of proof never shifts. The jury must first inquire and decide whether William G. Danz died a natural death. If he did, the defendant must be acquitted. If the jury shall decide that he died an unnatural death, then the question arises : was death due to arsenic administered with a felonious intent by Mrs Danz, the defendant? If it was not, the defendant must be acquitted. The commonwealth must show that not only was arsenic bought, but that the same was administered to William G. Danz, with a felonious intent by Mrs. Danz, the defendant, and that he died as a result thereof, and unless this is proven beyond a reasonable doubt, the defendant must be acquitted." The thirteenth point, as a correct statement of the law, was thus affirmed in

the general charge and in the answers to other points. To more than this the prisoner was not entitled; for, even under sec. 58 of the Act of March 31, 1860, P. L. 427, the court is not required to repeat instructions, if once clearly and correctly given in an answer or answers to other points, as they were given here. That section requires the court, on the trial of any indictment for murder or voluntary manslaughter, to give an opinion upon any point submitted by the defendant and stated in writing. Here, the opinion asked for in the thirteenth point was given in the manner stated. The point was not read to the jury, and no harm, therefore, was done her by the refusal to affirm it, for they did not know what it contained, and the specific instructions asked for by it were given them.

As to the assignment relating to alleged zeal and partisanship by the district attorney, amounting to misconduct, we fully concur with the learned trial judge in his answer to the first point, for we, too, have seen no evidence of anything to call for any criticism of that officer. Great stress is laid upon his failure to call Dr. McFarland. At the instance of a former district attorney this physician had made an examination of certain parts of the body of the deceased after its exhumation; but his report to the coroner of the result of that examination threw no light upon the cause of death. It does not appear that he had ever expressed an opinion that the deceased had not died from arsenical poison until called as a witness in support of the rule for a new trial. At an early stage of the trial counsel for the prisoner, as is not denied, was notified by the district attorney that he would not call this doctor as a witness, and that if the prisoner thought his testimony would be of any use to her she should call him. He testified that he could have attended as a witness for her if notified. Under the circumstances there was no duty on the part of the district attorney to call McFarland as a witness for the prosecution, quasi judicial officer though he be, as much concerned to see that no innocent person suffers as it is to see that no guilty man escapes. His full duty to the prisoner was discharged when he notified her that he would not call him, coupled with the notice that she must do so if she thought his testimony would help her.

Nothing more remains to be said in detail of the assignments.

Every question raised by the learned counsel for the appellant has been most carefully considered; and if we had any doubt about the correctness of any ruling or of any instruction given to the jury by the learned and careful trial judge, it would be resolved in favor of another trial. But we have no such doubt, and with the verdict of the jury, with whom exclusively were the facts, we cannot interfere.

The judgment is affirmed, and it is ordered that the record be remitted for due execution of the sentence.

MR. JUSTICE DEAN, dissenting:

The majority of the court have concluded to affirm this judgment; I cannot concur and do not stand alone in this nonconcurrence. The case was first argued at Pittsburg before a full bench; it was then affirmed by a majority of the court, but three judges did not join in the affirmance and two of them dissented of record. Justice THOMPSON, who was then a member of the court, wrote a dissenting opinion in which I joined, but the court thought best to order a reargument, which was had at this term. In the meantime, Justice THOMPSON's term, as a member of this court, had ended, so that, in fact, three judges nonconcurred in the judgment first determined on but in fact that left then the affirmation of the judgment standing by the bare majority of one of the court that first heard the argument. Affirmance of the judgment is now concurred in by five of the court who heard the reargument. While the judgment is that of the court, yet especially in a case of the gravity of this one, involving life, it has not the weight that it would have had if it had been rendered by an undivided court.

Our act of 1870, section 2, enacts, that "In all cases of murder in the first degree, removed into the Supreme Court, under the provisions of the first section of this act, or now pending in the said court, it shall be the duty of the judges thereof to review both the law and the evidence, and to determine whether the ingredients necessary to constitute murder in the first degree shall have been proved to exist." I am aware that this court has given a very narrow construction to these comprehensive words and has decided that they do not empower the court to review the question of the guilt or innocence of

the prisoner.   See Grant v. Commonwealth, 71 Pa. 495, and several cases following it.   Still, the question in a case like the one before us involves an argument of what are the ingredients necessary to constitute murder of the first degree. This judgment depends wholly upon circumstantial evidence and the first question that suggests itself to my mind is :   Was there sufficient evidence of the corpus delicti, that is, was the body of the offense proven clearly when the necessary ingredient of the offense was, that a murder had been actually committed?   It was an "ingredient" absolutely necessary for the commonwealth to prove, that a death had occurred from poison and then, that the intention in administering the poison was to take the life of the deceased; if these be not ingredients under the act of assembly, I cannot conceive what are; therefore, the circumstances must, under the rules governing the application of circumstantial evidence, point to the guilt of the accused and must be inconsistent with any other theory or, to adopt another form of statement, the circumstances must be irreconcilable with any other reasonable theory than that of guilt.   I think the circumstances are entirely reconcilable with the theory of innocence, that is, that first, the accused may have administered arsenic with the intention, under the advice of a quack doctor, of producing a condition of illness which would make intoxicating liquor entirely repugnant to him and bring about a reformation in his propensity to drunkenness or, second that there is no sufficient evidence that death was caused by any poison administered with the intent to produce death.   I do not differ from GIBSON, Chief Justice, in his masterly opinion in Commonwealth v. Harman, 4 Pa. 269, on the relative value of circumstantial and positive or direct evidence, but in arriving at a conclusion of guilt from purely circumstantial evidence, circumstances must be irreconcilable with any other reasonable theory than that of guilt.   In this case, the evidence, to my mind, points very strongly to the conclusion of innocence. I concede, that there were some circumstances which tended to cast suspicion on the accused but they were not significant; ought not to have the weight which the jury gave them.   They seemed, from their verdict, to have arrived at conclusions without an unbroken chain of circumstances pointing to but one result, but to have jumped to a conclusion

of guilt from immaterial circumstances.   As Lord Bacon says in Aphorism 45 of his Novum Organum, "There is a natural tendency in the human mind to suppose a greater order and conformity in things than actually exist."   This as is stated by Best on Presumptions, sec. 193, "May proceed in certain cases from indolence or aversion for the patient and accurate consideration of minute and ever-varying particulars. But perhaps the most common source of inaccurate reasoning from facts in cases of moral conduct is precipitation produced or heightened by moral emotion.   This is particularly the case where a great crime has been committed."   The evidence points, here, significantly and conclusively enough to the fact, that the accused was not a good woman and her conduct on many occasions was reprehensible, but we cannot say that a woman shall be hanged because she is not a good woman.   She can only justly be hanged, according to law, if she is guilty of murder, and yet these facts, to my mind, show nothing further than that this was a rough, uneducated woman, goaded to bad conduct by the drunkenness of a worthless husband, ofttimes expressing the very feelings that an exasperated woman would have toward a husband who had worried and illtreated her and she may, at the suggestion of the quack doctor, when she consulted him as to her husband's propensity for drunkenness and how to cure it, have administered the powders he gave her, and it is possible that these contained, with antimony, arsenic, but the essential ingredient of the offense, that she administered these powders, if they were poisonous, with intent to produce death, utterly fails; but not only does the proof of the felonious intent fail, but proof of the essential fact that the death was caused by poison fails.   True, there was some evidence that arsenic was found in the body of the deceased after death but not sufficient to have caused death.   The jury jumped to the conclusion that the death was caused by poison because a poisonous drug in a small quantity was found in the body after death, and then they jumped further, to the conclusion that because the accused had made wild and unkind declarations with reference to her husband, that she desired and brought about his death by the administration of this poison.   Taking the whole evidence, fact by fact, as proven, and massing them all together, they do not convey

to my mind properly the conclusion of guilt and I cannot concur in the judgment. As I have already noticed, these two essential ingredients of the offense are lacking : First, proof that death was caused by poison, and second, proof of the felonious intent that the poison was administered by the accused with intent to produce death. I have read this evidence very carefully and in the light of two able arguments, I cannot bring my mind to concur with the majority. I can see how the jury may have conscientiously found their verdict: First, on insufficient evidence, they found a great crime had been committed ; then, on insufficient evidence, that the wife of the deceased had committed this crime. The case was most zealously and most ably prosecuted by the commonwealth. Every circumstance, no matter how trivial, was held up before the jury as indicating guilt, but the main facts which are necessary to constitute ingredients of the offense were lacking.

For that reason, I would reverse the judgment and order a new trial.

MESTREZAT, J. I concur in this dissent.